No. 15-3440

# In the United States Court of Appeals for the Seventh Circuit

———————

MONARCH BEVERAGE COMPANY, INC., APPELLANT

*v.*

DAVID COOK, CHAIRMAN OF THE INDIANA ALCOHOL
AND TOBACCO COMMISSION; DALE GRUBB, COMMISSIONER
OF THE INDIANA ALCOHOL AND TOBACCO COMMISSION;
DAVID COLEMAN, COMMISSIONER OF THE INDIANA ALCOHOL
AND TOBACCO COMMISSION; AND MARJORIE MAGINN,
COMMISSIONER OF THE INDIANA ALCOHOL AND TOBACCO
COMMISSION, APPELLEES

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA (CIV. NO. 13-1674)
(THE HONORABLE SARAH EVANS BARKER, J.)*

———————

**BRIEF OF APPELLANT AND SHORT APPENDIX**

———————

RICHARD A. SMIKLE
DEREK R. MOLTER
ICE MILLER LLP
  *One American Square, Suite 2900*
  *Indianapolis, IN 46282*

KANNON K. SHANMUGAM
  *Counsel of Record*
AMY MASON SAHARIA
ALLISON B. JONES
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-3440

Short Caption: MONARCH BEVERAGE CO. v. GRUBB

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]**    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    MONARCH BEVERAGE COMPANY

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    WILLIAMS & CONNOLLY LLP

    ICE MILLER LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: s/ Kannon K. Shanmugam    Date: 1/8/2016

Attorney's Printed Name: Kannon K. Shanmugam

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** X  **No** _____

Address: Williams & Connolly LLP

    725 Twelfth Street, N.W., Washington, DC 20005

Phone Number: 202-434-5000    Fax Number: 202-434-5029

E-Mail Address: kshanmugam@wc.com

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-3440

Short Caption: MONARCH BEVERAGE CO. v. GRUBB

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    MONARCH BEVERAGE COMPANY

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    WILLIAMS & CONNOLLY LLP

    ICE MILLER LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: s/ Amy Mason Saharia    Date: 1/8/2016

Attorney's Printed Name: Amy Mason Saharia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ☒

Address: Williams & Connolly LLP

        725 Twelfth Street, N.W., Washington, DC 20005

Phone Number: 202-434-5000    Fax Number: 202-434-5029

E-Mail Address: asaharia@wc.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>15-3440</u>

Short Caption: <u>MONARCH BEVERAGE CO. v. GRUBB</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    MONARCH BEVERAGE COMPANY

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    WILLIAMS & CONNOLLY LLP

    ICE MILLER LLP

(3)   If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and

       N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: <u>s/ Allison B. Jones</u>      Date: <u>1/8/2016</u>

Attorney's Printed Name: <u>Allison B. Jones</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____  **No**  ✕

Address: <u>Williams & Connolly LLP</u>

        <u>725 Twelfth Street, N.W., Washington, DC 20005</u>

Phone Number: <u>202-434-5000</u>      Fax Number: <u>202-434-5029</u>

E-Mail Address: <u>ajones@wc.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-3440

Short Caption: MONARCH BEVERAGE CO. v. GRUBB

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

MONARCH BEVERAGE COMPANY

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

WILLIAMS & CONNOLLY LLP

ICE MILLER LLP

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature: s/ Katherine Moran Meeks    Date: 1/8/2016

Attorney's Printed Name: Katherine Moran Meeks

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ☒

Address: Williams & Connolly LLP

725 Twelfth Street, N.W., Washington, DC 20005

Phone Number: 202-434-5000    Fax Number: 202-434-5029

E-Mail Address: kmeeks@wc.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-3440

Short Caption: MONARCH BEVERAGE CO. v. GRUBB

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    MONARCH BEVERAGE COMPANY

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    WILLIAMS & CONNOLLY LLP

    ICE MILLER LLP

(3)   If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature: s/ Richard A. Smikle     Date: 1/8/2016

Attorney's Printed Name: Richard A. Smikle

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ✕

Address: Ice Miller LLP

    One American Square, Suite 2900, Indianapolis, IN 46282

Phone Number: 317-236-2400     Fax Number: 317-592-4760

E-Mail Address: richard.smikle@icemiller.com

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 15-3440

Short Caption: MONARCH BEVERAGE CO. v. GRUBB

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

MONARCH BEVERAGE COMPANY

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

WILLIAMS & CONNOLLY LLP

ICE MILLER LLP

(3) If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

     N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

     N/A

Attorney's Signature: s/ Derek R. Molter   Date: 1/8/2016

Attorney's Printed Name: Derek R. Molter

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No** ✕

Address: Ice Miller LLP

One American Square, Suite 2900, Indianapolis, IN 46282

Phone Number: 317-236-2400   Fax Number: 317-592-4760

E-Mail Address: derek.molter@icemiller.com

rev. 01/15 GA

# TABLE OF CONTENTS

Page

Statement of jurisdiction.................................................................1

Statement of the issues .................................................................1

Statement of the case ...................................................................2

    A.    Background...................................................................2

    B.    Procedural history ........................................................11

Summary of argument ................................................................17

Standard of review......................................................................19

Argument....................................................................................19

Indiana's disparate treatment of beer wholesalers violates the Equal
Protection Clause........................................................................19

    A.    The challenged provisions of the Indiana Alcoholic Beverages
        Law discriminate against beer wholesalers...................19

        1.    The district court erred by determining that Monarch
               was required to identify an identical 'comparator' as a
               threshold matter ................................................21

        2.    The mere fact that a person must choose to become a
               beer wholesaler does not immunize Indiana's disparate
               treatment from equal-protection review...........................28

    B.    Indiana's disparate treatment of beer wholesalers is not
        rationally related to any legitimate state interest .......................34

        1.    The challenged prohibition is not rationally related to
               the State's claimed interest in limiting alcohol
               consumption........................................................37

        2.    The challenged prohibition is not rationally related to
               the State's claimed interest in encouraging competition
               among wholesalers.................................................44

        3.    The challenged prohibition is not rationally related to
               any other legitimate state interest .......................47

Page

Table of contents—continued:

Conclusion.......................................................................................52

## TABLE OF AUTHORITIES

### CASES

*Arceneaux* v. *Treen*, 671 F.2d 128 (5th Cir. 1982) ...........................31

*Armour* v. *City of Indianapolis*, 132 S. Ct. 2073 (2012) .........................24, 52

*Arnold's Wines, Inc.* v. *Boyle*, 571 F.3d 185 (2d Cir. 2009) ............................2

*Borman's, Inc.* v. *Liquor Control Commission*,
    195 N.W.2d 316 (Mich. Ct. App. 1972) .........................................2

*Burrows* v. *Ohio High School Athletic Association*,
    891 F.2d 122 (6th Cir. 1989)...............................................30

*Christian Heritage Academy* v. *Oklahoma Secondary School
    Activities Association*, 483 F.3d 1025 (10th Cir. 2007)............................36

*City of Cleburne* v. *Cleburne Living Center, Inc.*,
    473 U.S. 432 (1985) ..............................................*passim*

*City of New Orleans* v. *Dukes*, 427 U.S. 297 (1976)................................35, 37

*Clements* v. *Fashing*, 457 U.S. 957 (1982).........................................30

*Collins* v. *Day*, 644 N.E.2d 72 (Ind. 1994) .......................................32

*Craig* v. *Boren*, 429 U.S. 190 (1976)...............................................20

*Craigmiles* v. *Giles*, 312 F.3d 220 (6th Cir. 2002) .............................37, 41, 51

*DeLee* v. *City of Plymouth*, 773 F.3d 172 (7th Cir. 2014) ............................19

*Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*,
    459 U.S. 400 (1983) ...........................................36, 51

Page

Cases—continued:

*Engquist* v. *Oregon Department of Agriculture*,
  553 U.S. 591 (2008) ......................................................21

*FCC* v. *Beach Communications, Inc.*, 508 U.S. 307 (1993) ............34, 35, 45

*Gault* v. *Garrison*, 569 F.2d 993 (7th Cir. 1977)............................................36

*Geinosky* v. *City of Chicago*, 675 F.3d 743 (7th Cir. 2012) .............21, 22, 23

*Goodpaster* v. *City of Indianapolis*,
  736 F.3d 1060 (7th Cir. 2013).............................................*passim*

*Granholm* v. *Heald*, 544 U.S. 460 (2005)....................................................4, 13

*Harvey* v. *Town of Merrillville*, 649 F.3d 526 (7th Cir. 2011)....................23

*Indiana Petroleum Marketers & Convenience Store Association*
  v. *Cook*, 808 F.3d 318 (7th Cir. 2015) ............................................20, 24, 29

*Johnson* v. *Robison*, 415 U.S. 361 (1974) ........................................................34

*Kansas Penn Gaming, LLC* v. *Collins*,
  656 F.3d 1210 (10th Cir. 2011)...............................................................22

*LaBella Winnetka, Inc.* v. *Village of Winnetka*,
  628 F.3d 937 (7th Cir. 2010)...................................................................23

*Lake County Beverage Co.* v. *21st Amendment, Inc.*,
  441 N.E.2d 1008 (Ind. Ct. App. 1982)........................................................11

*Mathews* v. *Lucas*, 427 U.S. 495 (1976)............................................................34

*Merrifield* v. *Lockyer*, 547 F.3d 978 (9th Cir. 2008) ..............................44, 51

*Monarch Beverage Co.* v. *Cook*, No. 49A02-1504-PL-245,
  ___ N.E.3d ___, 2015 WL 9197720
  (Ind. Ct. App. Dec. 17, 2015) .....................................................9, 31, 32, 33

Page

Cases—continued:

*Monarch Beverage Co.* v. *Cook*, No. 49D02-1403-PL-006456
(Ind. Super. Ct., Marion Cty. Apr. 22, 2015) ...............................9

*National Distributing Co.* v. *United States Treasury Department*,
626 F.2d 997 (D.C. Cir. 1980) ........................................................9

*Plyler* v. *Doe*, 457 U.S. 202 (1982)............................................25, 35

*Purze* v. *Winthrop Harbor*, 286 F.3d 452 (7th Cir. 2002) ............................22

*Racine Charter One, Inc.* v. *Racine Unified School District*,
424 F.3d 677 (7th Cir. 2005)....................................................22, 23

*RJB Properties, Inc.* v. *Board of Education of Chicago*,
468 F.3d 1005 (7th Cir. 2006)...........................................................23

*Ridenour* v. *Furness*, 514 N.E.2d 273 (Ind. 1987)........................................11

*Romer* v. *Evans*, 517 U.S. 620 (1996) ........................................................39, 41

*Smith* v. *City of Chicago*, 457 F.3d 643 (7th Cir. 2006) ..........................23, 35

*Srail* v. *Village of Lisle*, 588 F.3d 940 (7th Cir. 2009) ...............................23

*St. Joseph Abbey* v. *Castille*,
712 F.3d 215 (5th Cir. 2013)...............................................................35, 43

*Sutker* v. *Illinois State Dental Society*,
808 F.2d 632 (7th Cir. 1986)...........................................................34

*Swanson* v. *City of Chetek*, 719 F.3d 780 (7th Cir. 2013) .......................22, 23

*Totes-Isotoner Corp.* v. *United States*,
594 F.3d 1346 (Fed. Cir. 2010) .................................................33

*Tuffendsam* v. *Dearborn County Board of Health*,
385 F.3d 1124 (7th Cir. 2004)...........................................................22

*Turner* v. *Safley*, 482 U.S. 78 (1987)............................................................40

Page

Cases—continued:

*United States Department of Agriculture* v. *Moreno*,
    413 U.S. 528 (1973) .............................................................*passim*

*Vance* v. *Bradley*, 440 U.S. 93 (1979)..............................................29

*Village of Willowbrook* v. *Olech*, 528 U.S. 562 (2000)....................21

*Wisconsin Education Association Council* v. *Walker*,
    705 F.3d 640 (7th Cir. 2013)....................................24, 35, 40, 50

*Zobel* v. *Williams*, 457 U.S. 55 (1982).............................................41

## CONSTITUTIONS AND STATUTES

U.S. Const. Amend. XIV........................................................*passim*

U.S. Const. Amend. XXI...............................................6, 12, 20

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

42 U.S.C. § 1983 ...........................................................................1

Ind. Const. Art. 1, cl. 23 ...............................................9, 31, 32, 47

H. 144, 78th Reg. Sess., 1933 Ind. Acts 492....................................6

    1933 Ind. Acts 493-515, §§ 3, 8, 14, 24 .........................................6

    1933 Ind. Acts 499, § 8(a).............................................................7

H. 399, 78th Reg. Sess., 1935 Ind. Acts 1056:

    1935 Ind. Acts 1090-1091, § 9 .......................................................7

    1935 Ind. Acts. 1111-1114, 1187-1188, §§ 15, 41(g) ....................7

    1935 Ind. Acts 1191, § 41(o), (p) ...................................................7

Page

Statutes—continued:

1965 Ind. Acts 658, 659, § 2 ...............................................................13, 41

Pub. L. 224-2005, 2005 Ind. Acts 3624, 3636, § 19 ...................................13, 41

905 Ind. Admin. Code 1-5.1-1 ...............................................................4

905 Ind. Admin. Code 1-5.1-1(a)(6) ........................................................3

905 Ind. Admin. Code 1-5.1-10 ..............................................................3

905 Ind. Admin. Code 1-5.1-11 ..............................................................3

905 Ind. Admin. Code 1-31-1 ................................................................4

905 Ind. Admin. Code 1-31-2 ................................................................4

Ind. Code § 7.1-1-3-16.7 ....................................................................6

Ind. Code § 7.1-3-1-7 ........................................................................5

Ind. Code § 7.1-3-3-1 ........................................................................4

Ind. Code § 7.1-3-3-2 .......................................................................48

Ind. Code § 7.1-3-3-3 .......................................................................48

Ind. Code § 7.1-3-3-4 .......................................................................48

Ind. Code § 7.1-3-3-19 ....................................................................5, 12

Ind. Code § 7.1-3-4-1 ........................................................................3

Ind. Code § 7.1-3-5-1 ........................................................................3

Ind. Code § 7.1-3-8-1 ......................................................................4, 5

Ind. Code § 7.1-3-9-8 ........................................................................5

Ind. Code § 7.1-3-10-5 .......................................................................5

Page

Statutes—continued:

Ind. Code § 7.1-3-10-6................................................................5

Ind. Code § 7.1-3-13-1................................................................4

Ind. Code § 7.1-3-13-3(a)............................................................6

Ind. Code § 7.1-3-13-3(d)............................................................6

Ind. Code § 7.1-3-22-2................................................................4

Ind. Code §§ 7.1-3-25-1 to 7.1-3-25-15 ...............................13, 14, 42

Ind. Code § 7.1-4-2-1................................................................38

Ind. Code § 7.1-4-3-1................................................................38

Ind. Code § 7.1-4-4-1................................................................38

Ind. Code § 7.1-5-5-7.............................................................11, 39

Ind. Code § 7.1-5-5-7(a)............................................................4

Ind. Code § 7.1-5-5-9(c) ....................................................13, 14, 42

Ind. Code § 7.1-5-9-2................................................................3

Ind. Code § 7.1-5-9-3................................................................12

Ind. Code § 7.1-5-9-3(b)........................................................5, 30

Ind. Code § 7.1-5-9-4...........................................................*passim*

Ind. Code § 7.1-5-9-6..........................................................6, 12

Ind. Code § 7.1-5-9-7................................................................3

Ind. Code § 7.1-5-9-8................................................................3

Ind. Code § 7.1-5-9-9................................................................3

Page

Statutes—continued:

Ind. Code § 7.1-5-9-10.........................................................................3

Iowa Code Ann. § 123.22....................................................................5

Mich. Comp. Laws § 436.1203(6).......................................................5

### MISCELLANEOUS

Raymond B. Fosdick & Albert L. Scott,
    *Toward Liquor Control* (Center for Alcohol Policy 2011).............*passim*

Patricia A. Morgan, *Power, Politics and Public Health:*
    *The Political Power of the Alcohol Beverage Industry,*
    9 J. Pub. Health Pol'y 177 (1988) ................................................10

Richard A. Posner, *Antitrust Law* (2d ed. 2001) .........................44

Giovanna Shay, *Similarly Situated,*
    18 Geo. Mason L. Rev. 581 (2011).......................................24, 26

Andrew Tamayo, Comment, *What's Brewing in the Old North State:*
    *An Analysis of the Beer Distribution Laws Regulating North*
    *Carolina's Craft Breweries,* 88 N.C. L. Rev. 2198 (2010)................14, 43

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331, because appellant Monarch Beverage Company seeks injunctive and declaratory relief against appellees in their official capacities under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The district court entered final judgment disposing of all parties' claims on September 30, 2015. App. 22. Monarch filed a timely notice of appeal on October 30, 2015. D. Ct. Dkt. 115. The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred by holding that the Indiana Alcoholic Beverages Law, which denies beer wholesalers the ability to obtain a permit to distribute liquor, does not treat beer wholesalers differently from other persons.

2.    Whether the district court erred by holding that Indiana's disparate treatment of beer wholesalers is rationally related to a legitimate state interest and thus does not violate the Equal Protection Clause of the Fourteenth Amendment.

## STATEMENT OF THE CASE

### A.     Background

1.     In the aftermath of Prohibition, States structured their alcohol distribution systems to prevent the resurrection of the "tied houses" that had existed before Prohibition.  "Tied houses" were retail "establishments under contract to sell exclusively the product of one manufacturer."  Raymond B. Fosdick & Albert L. Scott, *Toward Liquor Control* 29 (Center for Alcohol Policy 2011) (Fosdick & Scott); *see also Arnold's Wines, Inc.* v. *Boyle*, 571 F.3d 185, 187 (2d Cir. 2009); *Borman's, Inc.* v. *Liquor Control Commission*, 195 N.W.2d 316, 319 (Mich. Ct. App. 1972).  Policymakers blamed pre-Prohibition alcohol-related ills on the existence of these "tied houses," which were viewed as having "all the vices of absentee ownership."  Fosdick & Scott 29.  According to temperance advocates, the absentee manufacturers that controlled the retail establishments "knew nothing and cared nothing about the community" and were interested only in "increased sales."  *Id.*

To protect alcohol retailers from the influence of manufacturers, Indiana, like all of the other States, adopted a three-tier system of alcohol distribution.  *See* D. Ct. Dkt. 95-1, at 60-61; D. Ct. Dkt. 95-3, at 26.  The first tier consists of manufacturers of alcohol products.  *See* D. Ct. Dkt. 95-1, at 60-61. The middle tier consists of wholesalers; they buy alcohol products from manufacturers and sell those products to retailers and dealers, which constitute

the third tier.  *See* D. Ct. Dkt. 95-2, at 23, 27.[1]  Retailers and dealers then sell alcohol products directly to consumers.  *See id.* at 27.

With limited exceptions, an entity that operates in one tier of the three-tier system cannot have an interest in another tier.  *See* Ind. Code §§ 7.1-5-9-2, 7.1-5-9-4, 7.1-5-9-7, 7.1-5-9-8, 7.1-5-9-9, 7.1-5-9-10; D. Ct. Dkt. 95-1, at 84-85.  The wholesale tier thus serves as a buffer between manufacturers and retailers/dealers.  *See* D. Ct. Dkt. 95-2, at 23-24; D. Ct. Dkt. 95-3, at 147.  The wholesale tier also serves as a port of entry for out-of-state alcohol products, facilitates the collection of taxes, and ensures that alcohol products are sold only to licensed retailers/dealers.  *See* D. Ct. Dkt. 95-2, at 24-25.

Indiana law contains a number of provisions designed to protect the retailer/dealer tier from the influence of other participants in the three-tier system.  Wholesalers are prohibited from tying the purchase of one alcohol product to the purchase of another.  *See* 905 Ind. Admin. Code 1-5.1-11; D. Ct. Dkt. 95-1, at 88-89, 253.  For example, a wholesaler that distributes beer and wine cannot require a retailer/dealer to buy certain wine products as a condition of buying the wholesaler's beer products.  *See* D. Ct. Dkt. 95-1, at 88-89.  Wholesalers cannot impose minimum purchase requirements on retailers/dealers.  *See* 905 Ind. Admin. Code 1-5.1-1(a)(6), 1-5.1-10.  Wholesalers

---

[1] Retailers, which include bars and restaurants, sell alcohol products for on-premises consumption; dealers, which include liquor and grocery stores, sell for off-premises consumption.  *See* Ind. Code §§ 7.1-3-4-1, 7.1-3-5-1.

3

cannot enter into exclusivity contracts with retailers/dealers. *See* 905 Ind. Admin. Code 1-5.1-1; D. Ct. Dkt. 95-2, at 31-32. And wholesalers must disseminate their prices in writing to customers and offer all customers the same prices on a non-discriminatory basis. *See* Ind. Code § 7.1-5-5-7(a); 905 Ind. Admin. Code 1-31-1, 1-31-2; D. Ct. Dkt. 95-1, at 86-88, 91.

The Supreme Court has recognized that the three-tier system is "unquestionably legitimate," *Granholm* v. *Heald*, 544 U.S. 460, 489 (2005) (citation omitted), and Monarch is not challenging the existence of that system in Indiana. Monarch instead challenges provisions of the Indiana Alcoholic Beverages Law that discriminate against certain participants within one tier of that system—beer wholesalers.

2.    a.    This case concerns a prohibition in the wholesale tier that is unique to the State of Indiana. Indiana issues separate permits for beer wholesalers, wine wholesalers, and liquor wholesalers. *See* Ind. Code §§ 7.1-3-3-1, 7.1-3-8-1, 7.1-3-13-1. Beer wholesale permits are issued by county, although a beer wholesaler may operate on a statewide basis. There are limits on the number of beer wholesale permits that may be issued in any county. *See* Ind. Code § 7.1-3-22-2; D. Ct. Dkt. 95-1, at 122-123. Wine and liquor wholesale permits are issued on a statewide basis, and there are no limits on the number of such permits that can be issued. *See* D. Ct. Dkt. 95-2, at 41-42. As matters currently stand, however, there are only five liquor wholesalers

that operate in Indiana, three of which are large national companies. *See id.* at 45; D. Ct. Dkt. 95-3, at 107.[2]

Alone among the States that permit the private distribution of liquor,[3] Indiana categorically bars a beer wholesaler from obtaining a liquor wholesale permit. The Alcoholic Beverages Law provides in relevant part that "[i]t is unlawful for the holder of a . . . beer wholesaler's permit to have an interest in a liquor permit of any type under this title." Ind. Code § 7.1-5-9-3(b); *see also id.* §§ 7.1-3-3-19, 7.1-5-9-4; D. Ct. Dkt. 95-1, at 213, 215; D. Ct. Dkt. 95-2, at 44-45; D. Ct. Dkt. 95-16, at 3. Thus, even if a beer wholesaler otherwise satisfies the (minimal) criteria for becoming a liquor wholesaler, *see* Ind. Code §§ 7.1-3-1-7, 7.1-3-8-1; D. Ct. Dkt. 95-2, at 40-42, it cannot obtain a liquor wholesale permit.[4]

---

[2] Two of those three companies, Glazer's and Southern Wine and Spirits, have reportedly received approval from the Federal Trade Commission to merge. *See* Wine Business Blog, *FTC Approves Merger of Southern and Glazer's* (Jan. 4, 2016) <tinyurl.com/southernmerger>.

[3] A minority of States are so-called "control States" that maintain state control over the distribution of liquor. *See, e.g.*, Iowa Code Ann. § 123.22; Mich. Comp. Laws § 436.1203(6); *cf.* Raymond B. Fosdick & Albert L. Scott, *Toward Liquor Control* 41-44 (Center for Alcohol Policy 2011) (recommending that "the state government take[] over, as a public monopoly, the retail sale, through its own stores, of the heavier alcoholic beverages").

[4] Indiana does not repeat this segregation of beer and liquor at the retailer/dealer level. Retailers and dealers may obtain permits to sell beer, wine, *and* liquor. *See* Ind. Code §§ 7.1-3-9-8, 7.1-3-10-5, 7.1-3-10-6; D. Ct. Dkt. 95-1, at 115-116.

Indiana also imposes a separate but symmetric restriction on liquor wholesalers:  liquor wholesalers may not obtain a permit to wholesale beer. *See* Ind. Code § 7.1-5-9-6.  Thus, under Indiana law, beer wholesalers, by virtue of being beer wholesalers, may not distribute liquor.  And liquor wholesalers, by virtue of being liquor wholesalers, may not distribute beer.[5]

b.     The undisputed evidence establishes that Indiana's unique treatment of beer wholesalers was originally adopted in order to promote and protect a patronage system that operated to the benefit of state and local politicians.  The restriction dates back to the years following the end of Prohibition.  In 1933, in anticipation of the adoption of the Twenty-first Amendment, the Indiana General Assembly passed a law regulating the production and sale of alcohol within the State (the "1933 Act").  *See* H. 144, 78th Reg. Sess., 1933 Ind. Acts 492 (D. Ct. Dkt. 95-4).  The 1933 Act enabled state authorities to issue separate licenses to wholesale beer, wine, and liquor.  *See id.* at 493-515, §§ 3, 8, 14, 24.

---

[5] The Indiana General Assembly has created several exceptions to these prohibitions.  A liquor wholesaler that also has a wine wholesale permit may distribute up to a million gallons annually of flavored malt beverages, a type of beer.  *See* Ind. Code §§ 7.1-1-3-16.7, 7.1-3-13-3(d); D. Ct. Dkt. 95-1, at 123; D. Ct. Dkt. 95-3, at 93.  And a beer wholesaler that also has a wine wholesale permit may distribute brandy and certain cream-based liqueurs.  *See* Ind. Code § 7.1-3-13-3(a); D. Ct. Dkt. 95-1, at 216.

Although the 1933 Act did not prohibit beer wholesalers from holding a liquor wholesale permit, it did impose certain limits on beer distribution. The Act instituted the requirements, currently in effect today, that beer wholesalers' licenses are issued on a county-by-county basis and that the number of licenses is limited. *See* 1933 Ind. Acts 498-499, § 8(a). In practice, only supporters of then-Governor Paul McNutt received wholesale permits. *See* D. Ct. Dkt. 95-6, 95-7, at 3.

In 1935, the General Assembly repealed the 1933 Act and replaced it with the Liquor Control Act, which established Indiana's three-tier system in largely its present form. *See* H. 399, 79th Reg. Sess., 1935 Ind. Acts 1056, 1111-1114, 1187-1188, §§ 15, 41(g) (D. Ct. Dkt. 95-5). The Liquor Control Act maintained the county-by-county and numerical limitations on the issuance of beer wholesaler permits. *See id.* at 1090-1091, § 9. Of particular note here, the Act imposed an additional limitation prohibiting a beer wholesaler from obtaining a liquor wholesale permit. *See id.* at 1191, § 41(o), (p). That restriction has remained part of Indiana law ever since.

The General Assembly did not provide any explanation for why it decided to restrict beer wholesalers from holding a liquor wholesale permit, nor has it provided any explanation in the decades since then. The uncontested historical evidence suggests that the prohibition was enacted to protect and promote a patronage system that operated to the benefit of state and local

politicians.  *See* D. Ct. Dkt. 95-8.  It was widely recognized at the time that the Liquor Control Act facilitated political patronage.  *See* D. Ct. Dkt. 95-10, 95-12, 95-13.  Both supporters and opponents of the sale of alcohol agreed that "[t]he alcoholic beverages law  .  .  .  was designed to make political control possible."  D. Ct. Dkt. 95-12.  The excise administrator at the time admitted that "politics plays at least some part in granting or rejecting licenses." *Id.*  As he put it, "[n]aturally we give attention to the county chairmen and what they have to say."  *Id.*; *see also* D. Ct. Dkt. 95-14, 95-15.

At a 2008 Commission hearing, Jim LaCrosse, the owner of National Wine and Spirits, a liquor wholesaler, confirmed that political patronage motivated the restriction.  He explained that "the statewide politicians got the spirits licenses  .  .  .  and the beer distributors['] licenses went to the county politicians."  D. Ct. Dkt. 81-3, at 41.  He added that "[t]here's no rational business reason for [the prohibition], but having said that, this is how the industry in this state goes."  *Id.*  The then-chairman of the Commission, David Heath, characterized this account as a "very true statement."  *Id.*

In the proceedings below, defendants did not dispute the historical origins of the prohibition on joint wholesaling.  To the contrary, former Commission chairman Alex Huskey admitted in his deposition that "there's a lot of historical fact" supporting the patronage-based origins of the prohibition. D. Ct. Dkt. 95-1, at 195-196.  Chairman Huskey also acknowledged that por-

tions of Indiana's alcohol laws are "antiquated." *Id.* at 107. Recently, an Indiana state court judge similarly (if less diplomatically) characterized Indiana's unique restriction on beer wholesalers as, "by today's standards, silly, unnecessary, inefficient, and a conv[olu]ted system with little merit that restricts free and open trade," although the judge upheld the restriction under the Equal Privileges and Immunities Clause of the Indiana Constitution. App. 50 (Order at 2, *Monarch Beverage Co.* v. *Cook*, No. 49D02-1403-PL-006456 (Ind. Super. Ct., Marion Cty. Apr. 22, 2015), *aff'd*, No. 49A02-1504-PL-245, ___ N.E.3d ___, 2015 WL 9197720 (Ind. Ct. App. Dec. 17, 2015)).

Recently, a bipartisan legislative committee concluded that "Indiana's alcohol laws have demonstrated a []consistency of inconsistency whereby alcohol policy has been driven by the monetary gains or losses of varying sectors within the three-tier system as opposed to maintenance of a uniform regulatory policy consistent with the general purposes enacted in 1973." D. Ct. Dkt. 95-18, at 25. In his deposition, former Commission chairman Huskey agreed with that assessment. D. Ct. Dkt. 95-1, at 191.

3. At the time the restraint on joint distribution was enacted in 1935, policymakers were concerned that liquor prices were too high. After the Nation emerged from Prohibition, a small number of liquor producers came to dominate the industry, commanding monopoly prices for their products. *See National Distributing Co.* v. *United States Treasury Department*,

9

626 F.2d 997, 1006-1007 (D.C. Cir. 1980).  As liquor prices soared, bootleg-ging thrived, *id.* at 1007-1008, which spawned a host of social problems, *see* Patricia A. Morgan, *Power, Politics and Public Health:  The Political Power of the Alcohol Beverage Industry*, 9 J. Pub. Health Pol'y 177, 183-184 (1988). Accordingly, federal and state regulation at the time was designed to elimi-nate bootlegging by lowering liquor prices.  *See* Fosdick & Scott 71 (noting that "[n]othing will so quickly demobilize the moonshiner and the bootlegger, and throw into chaos the corrupt system they have created, as reasonable liquor taxes and low liquor prices").

Consistent with the recommendations of post-Prohibition policymak-ers, Indiana has adopted a laissez-faire approach to regulating alcohol prices. According to one former chairman of the Commission, Indiana has "fairly consistent[ly]" had "very, very low excise tax[es] compared to other states." D. Ct. Dkt. 95-1, at 271.  As of 2013, Indiana ranked 42nd among the States in its excise-tax rates for beer, 35th for wine, and 42nd for liquor.  *See* D. Ct. Dkt. 95-19, 95-20, 95-21.

Indiana has also eschewed a number of other mechanisms by which to regulate alcohol prices.  Indiana has no statutory provision preventing manu-facturers, wholesalers, or retailers from selling at below-cost prices.  *See* D. Ct. Dkt. 95-1, at 236; D. Ct. Dkt. 95-2, at 33-34.  Indiana similarly does not require minimum mark-ups.  *See* D. Ct. Dkt. 95-1, at 235-236; D. Ct. Dkt. 95-

2, at 33.  Indiana does not prohibit volume discounts; to the contrary, it expressly permits volume discounts at the wholesale level.  *See* Ind. Code § 7.1-5-5-7; D. Ct. Dkt. 95-1, at 236; D. Ct. Dkt. 95-2, at 34-35; *Lake County Beverage Co.* v. *21st Amendment, Inc.*, 441 N.E.2d 1008, 1012-1014 (Ind. Ct. App. 1982) (construing section 7.1-5-5-7), *overruled on other grounds by Ridenour* v. *Furness*, 514 N.E.2d 273 (Ind. 1987).  In fact, the only price regulation in Indiana at any level of the three-tier system is the requirement that wholesalers offer the same prices to all retailers/dealers.  *See* D. Ct. Dkt. 95-1, at 237, 275; D. Ct. Dkt. 95-2, at 33-34, 52.

4.     Monarch is an Indiana company that has been in business since 1947.  D. Ct. Dkt. 95-3, at 13.  Monarch employs 300 people in Indiana.  *Id.* at 38.  Monarch holds permits issued by the Commission to distribute both beer and wine, and it currently distributes both products.  *Id.* at 24.

Among other wine products, Monarch distributes wine products manufactured by E. & J. Gallo Winery.  D. Ct. Dkt. 95-3, at 46.  Gallo also manufactures four liquor products.  *Id.* at 99.  Monarch would like to distribute Gallo's liquor products in Indiana, but it is unable to do so because, as a beer wholesaler, it is barred from receiving a liquor wholesale permit.  *Id.*

### B.     Procedural History

1.     Monarch commenced this action on October 21, 2013.  In its complaint, Monarch alleged that "Indiana's Alcoholic Beverages law  .  .  .  cre-

ates two classes of persons:  beer wholesalers (who may not obtain a liquor wholesaler's permit), and everyone else (who may)."  App. 26; *see also* App. 33.  It further alleged that this statutory classification does not have any rational relationship to legitimate state interests.  App. 33-36.  Accordingly, Monarch claimed, the classification violates the Equal Protection Clause of the Fourteenth Amendment.  App. 37.  Monarch requested a declaration that sections 7.1-3-3-19, 7.1-5-9-3, 7.1-5-9-4, and 7.1-5-9-6 of the Indiana Code are unconstitutional "to the extent that those provisions bar beer wholesalers from obtaining liquor wholesaler's permits," and also sought injunctive relief prohibiting enforcement of the prohibition against beer wholesalers.  *Id.*

The parties engaged in a period of discovery.  In the course of that discovery, counsel for defendants conceded that eliminating the challenged restriction on beer wholesalers would have "very little economic impact on the State of Indiana" and would "not have any major impact on Indiana beyond its alcohol wholesalers."  App. 46 (D. Ct. Dkt. 95-17, at 7).

The parties then filed cross-motions for summary judgment.  In their motion, defendants argued that Monarch's claim did not even trigger review under the Equal Protection Clause.  They based that assertion on three theories.  *First*, they argued that the Twenty-first Amendment gave the State "virtually complete control" over Indiana's alcohol-distribution system, suggesting that the Twenty-first Amendment thus barred an equal-protection

challenge. D. Ct. Dkt. 80, at 23 (quoting *Granholm* v. *Heald*, 544 U.S. 460, 488 (2005)). *Second*, they contended that Monarch could not state an equal-protection claim because it could not identify a "similarly situated" comparator—*i.e.*, a beer wholesaler—that was permitted to distribute liquor. *Id.* at 24-25. *Third*, they argued that, because a person has the "option" *ex ante* to become a beer wholesaler instead of a liquor wholesaler, Indiana's disparate treatment of beer wholesalers was immune from review. *Id.* at 25-26.

Turning to the substance of the equal-protection analysis, defendants did not identify any evidence of the Indiana General Assembly's actual motivation for enacting the prohibition in 1935, nor did they contest Monarch's evidence of the prohibition's patronage-based origins. Instead, defendants sought to justify the prohibition on two conflicting hypothetical rationales.

*First*, they argued that the prohibition serves to keep alcohol prices high and thereby to lower consumption. D. Ct. Dkt. 80, at 32-33. As support for that argument, defendants pointed to the fact that, under Indiana law, beer wholesalers are protected from unfair termination from beer manufacturers. *See* Ind. Code §§ 7.1-5-5-9(c), 7.1-3-25-1 to 7.1-3-25-15. Those so-called "franchise" protections were first enacted in Indiana in 1965 (and later expanded in 2005). *See* 1965 Ind. Acts 658, 659, § 2; Pub. L. 224-2005, 2005 Ind. Acts 3624, 3636, § 19. They prohibit brewers from terminating a beer wholesaler's distribution contract "unfairly and without due regard for the

13

equities of the [wholesaler]," Ind. Code § 7.1-5-5-9(c), and establish procedures by which a brewer that succeeds to another brewer's business can transfer that brewer's distribution rights to another wholesaler, *id.* §§ 7.1-3-25-1 to 7.1-3-25-15. Around the same time, similar protections were adopted by legislatures nationwide in order to address the "increasing concentration of market dominance among the top brewers and the corresponding bargaining power they possessed relative to wholesalers." Andrew Tamayo, Comment, *What's Brewing in the Old North State: An Analysis of the Beer Distribution Laws Regulating North Carolina's Craft Breweries*, 88 N.C. L. Rev. 2198, 2202 (2010) (Tamayo). According to defendants, those statutory protections against actions by beer manufacturers would somehow enable beer wholesalers to cut their prices in order to get into the liquor market, thereby fueling alcohol consumption.

*Second*, defendants argued that, if Monarch were permitted to distribute liquor, Monarch would force liquor wholesalers out of business and thereby decrease competition (which, under basic economic principles, would increase rather than decrease prices). D. Ct. Dkt. 80, at 33-35. According to defendants, a rational legislator could believe that having more distributors would be good for the three-tier system, produce higher employment and tax revenue, and increase the number of industry "watchdogs" reporting violations to the Commission.

2.    On September 30, 2015, the district court granted defendants' motion for summary judgment and denied Monarch's cross-motion for summary judgment. App. 1. The district court rested its decision on two alternative grounds.

*First*, the district court held that Monarch's claim of disparate treatment does not even trigger equal-protection review. App. 8-11. At the outset, the court faulted Monarch for failing to identify an identical "comparator" that received greater benefits under the law. App. 8. Notwithstanding its conclusion that Monarch had not identified a "comparator," however, the district court proceeded to consider whether beer wholesalers are "sufficiently similar" to wine and liquor wholesalers to "support an Equal Protection Clause violation." App. 10. The court concluded that beer wholesalers are not similar to wine and liquor wholesalers because of the franchise protections granted to beer wholesalers. App. 11. The district court did not analyze or discuss the relationship, if any, between those franchise protections and any legitimate state interests justifying the prohibition on joint wholesaling. To the contrary, later in its opinion, the district court expressly declined to consider whether "the existence of the 'franchise protections' granted only to beer wholesalers would be a sufficient justification for prohibiting beer wholesalers from also engaging in liquor wholesaling." App. 18 n.9.

*Second*, the district court held, in the alternative, that Indiana's restriction on beer wholesalers is rationally related to legitimate state interests. The court accepted defendants' argument that "*increased* competition from beer wholesalers could depress liquor prices, leading to increased liquor consumption, addiction, and other societal ills." App. 14 (emphasis added). The court also accepted defendants' argument that, "in addition to maintaining high prices on alcohol, the prohibition restricting beer wholesalers from also obtaining liquor permits and vice-versa results in a higher overall number of wholesalers in Indiana, given that beer wholesalers would otherwise have the power to eliminate the current liquor wholesalers"—*i.e.*, to *decrease* competition. App. 16. According to the court, maintaining a large number of wholesalers is desirable because (1) it correlates to increased tax revenue and (2) "the number of wholesalers equals the number of industry 'watchdogs' who report violations to the . . . Commission." App. 17. Finding those interests to be "plausible," the district court concluded that defendants were entitled to summary judgment. App. 18.

## SUMMARY OF ARGUMENT

The challenged provisions of the Indiana Alcoholic Beverages Law prohibiting beer wholesalers from distributing liquor discriminate against beer wholesalers and are not rationally related to any legitimate state interest.  Accordingly, they violate the Equal Protection Clause of the Fourteenth Amendment, and the judgment of the district court should be reversed.

A.    The challenged provisions of the Alcoholic Beverages Law discriminate against the class of beer wholesalers on their face.  Those provisions expressly identify a statutory class (beer wholesalers) and deny that class a benefit available to other persons:  namely, the ability to apply for and obtain a liquor wholesale permit.

The district court erred in holding that Monarch's claim of disparate treatment does not even trigger equal-protection review on the ground that Monarch had not identified an identical "comparator."  The district court improperly imported that requirement from "class of one" cases, in which this Court typically requires a plaintiff to identify an identical "comparator" at the threshold as a means of determining whether the defendant discriminated against the plaintiff on an improper ground.  Where the basis for the disparate treatment is evident on the face of the statute, as here, courts do *not* apply a threshold "comparator" requirement.  Instead, the relevant inquiry

is simply whether there is a rational relationship between the disparate treatment and a legitimate state interest.

This Court should reject defendants' related argument that Indiana law does not discriminate against beer wholesalers because it offers all persons the same *ex ante* choice to become either a beer wholesaler or a liquor wholesaler. That position lacks any support in the case law. If accepted, it would eliminate equal-protection review of discrimination against classes that persons join voluntarily, and it would render much economic regulation immune from equal-protection review.

B.     The district court also erred in holding that Indiana's disparate treatment of beer wholesalers has a rational relationship to a legitimate state interest. None of the hypothetical interests conjured up by defendants rationally supports the prohibition. The prohibition has no plausible connection to Indiana's asserted interest in maintaining high alcohol prices in order to limit consumption; defendants' supposition that beer wholesalers could somehow undercut liquor wholesalers' prices if they were permitted to sell liquor has no footing in the realities of Indiana's statutory scheme. Nor can the prohibition, which on its face *impedes* competition, plausibly be viewed as serving an interest in maintaining a large number of wholesalers and thus *promoting* competition (which, it bears emphasizing, would decrease rather than increase prices).

Defendants' struggles to identify coherent rationales for the prohibition are unsurprising.  After all, defendants did not dispute below that the prohibition was actually born of an illegitimate state interest in allocating political patronage.  Today, the only purpose of the prohibition is to protect politically favored liquor wholesalers from competition, which is, without doubt, an illegitimate interest.  Indiana's disparate treatment of beer wholesalers violates the Equal Protection Clause, and this Court should therefore reverse the district court's judgment in defendants' favor.

## STANDARD OF REVIEW

This Court reviews a district court's decision on cross-motions for summary judgment de novo.  *See, e.g.*, *DeLee* v. *City of Plymouth*, 773 F.3d 172, 174 (7th Cir. 2014).

## ARGUMENT

## INDIANA'S DISPARATE TREATMENT OF BEER WHOLESALERS VIOLATES THE EQUAL PROTECTION CLAUSE

### A.   The Challenged Provisions Of The Indiana Alcoholic Beverages Law Discriminate Against Beer Wholesalers

When a law discriminates between two non-suspect classes, the relevant inquiry under the Equal Protection Clause is whether the disparate treatment "bear[s] a rational relationship to some legitimate end." *Goodpaster* v. *City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (citation omit-

ted).[6] Because the challenged provisions of the Indiana Alcoholic Beverages Law discriminate between beer wholesalers (who are barred from obtaining liquor wholesale permits) and all other persons (who may obtain liquor wholesale permits), the relevant inquiry here is whether Indiana's disparate treatment of beer wholesalers is rationally related to legitimate state interests.

This Court should reject defendants' attempts to immunize Indiana's prohibition on joint wholesaling from equal-protection review altogether. Because Monarch's claim is based on an express statutory classification, Monarch was not required at the threshold to identify an identical "comparator"—a requirement the district court erroneously imported from "class of one" cases. And the mere fact that persons are not born beer wholesalers, but must choose to become them, does not shield from equal-protection review the discriminatory consequences that flow from that choice.

---

[6] As noted above, defendants argued below that their disparate treatment of beer wholesalers "is protected by the Twenty-first Amendment from a constitutional challenge" under the Equal Protection Clause. D. Ct. Dkt. 99, at 6-7. This Court recently rejected that very argument. *See Indiana Petroleum Marketers & Convenience Store Association* v. *Cook*, 808 F.3d 318, 322 (7th Cir. 2015) (citing *Craig* v. *Boren*, 429 U.S. 190, 209 (1976)).

20

### 1.  The District Court Erred By Determining That Monarch Was Required As A Threshold Matter To Identify An Identical 'Comparator'

a.    The district court erroneously erected a threshold barrier to Monarch's equal-protection claim based on inapposite "class of one" cases. The Supreme Court has recognized that the Equal Protection Clause protects persons "against intentional and arbitrary discrimination, whether occasioned by express terms of a statute *or* by its improper execution through duly constituted agents." *Village of Willowbrook* v. *Olech*, 528 U.S. 562, 564 (2000) (per curiam) (emphasis added) (citation omitted).  This case involves the former form of discrimination—one "occasioned by express terms of a statute." *Id.* (citation omitted).  The cases from which the district court distilled the "comparator" requirement involve the latter form of discrimination—namely, discrimination that arises from "improper execution" of the law. *Id.* (citation omitted).  Those cases involve "a cause of action on behalf of a 'class of one' where the plaintiff [does] not allege membership in a class or group" that is the subject of an express statutory classification. *Id.*

To prevail on a "class of one" equal-protection claim, a plaintiff must demonstrate that "he was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Geinosky* v. *City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012) (quoting *Engquist* v. *Oregon Department of Agriculture*, 553 U.S. 591, 601 (2008)).

21

Because the "class of one" theory opens up "[b]reathtaking vistas of liability," *Tuffendsam* v. *Dearborn County Board of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004), this Court "relie[s] on careful application of the similarly-situated requirement to distinguish between unfortunate mistakes and actionable, deliberate discrimination," *Geinosky*, 675 F.3d at 747-748. Thus, under this Court's cases, a "class of one" plaintiff must ordinarily prove that he was "treated differently than someone who is *prima facie* identical in all relevant respects." *Purze* v. *Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *accord, e.g.*, *Racine Charter One, Inc.* v. *Racine Unified School District*, 424 F.3d 677, 680 (7th Cir. 2005).

The requirement of identifying an identical "comparator" serves primarily to prove the required element of improper motive. *See Swanson* v. *City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). In "class of one" claims involving selective enforcement of the law, the "improper motive is usually covert." *Id.* To prove motive, "courts look to the treatment of similarly situated individuals: if all principal characteristics of the two individuals are the same, and one received more favorable treatment, this may show there was no proper motivation for the disparate treatment." *Id.*; *see also Kansas Penn Gaming, LLC* v. *Collins*, 656 F.3d 1210, 1218 (10th Cir. 2011) (explaining that a "strict reading" of the "similarly situated" inquiry is necessary in "class of one" cases to weed out claims "where [a] government actor enjoys a

broader range of discretion, and may properly base a decision on a myriad of potentially relevant variables"). Notably, even in "class of one" cases, this Court does not require a plaintiff to identify a "comparator" where improper motive is "readily obvious" or "easily demonstrated" by other means. *Swanson*, 719 F.3d at 784; *accord Geinosky*, 675 F.3d at 748.

     b.    Every one of the Seventh Circuit cases that the district court cited in support of the proposition that Monarch was required to identify an identical "comparator" involved a "class of one" or selective-enforcement claim. *See Harvey* v. *Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011); *LaBella Winnetka, Inc.* v. *Village of Winnetka*, 628 F.3d 937, 941-942 (7th Cir. 2010); *Srail* v. *Village of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009); *RJB Properties, Inc.* v. *Board of Education of Chicago*, 468 F.3d 1005, 1010 (7th Cir. 2006); *Smith* v. *City of Chicago*, 457 F.3d 643, 650-651 (7th Cir. 2006); *Racine Charter One*, 424 F.3d at 680. The district court did not cite any case in which this Court, or any other court, applied a threshold "comparator" requirement in the case of an express statutory classification.

     Monarch's claim is decidedly not a "class of one" claim. As Monarch alleged in its complaint, "Indiana's Alcoholic Beverages law . . . creates two classes of persons: beer wholesalers (who may not obtain a liquor wholesaler's permit), and everyone else (who may)." App. 26. The statute identifies a distinct class—beer wholesalers—and denies that class a privilege available

to everyone else.  The relevant inquiry under the Equal Protection Clause is simply whether this statutory classification "bear[s] a rational relationship to some legitimate end." *Goodpaster*, 736 F.3d at 1071 (citation omitted).

      c.    In contrast to the "class of one" cases on which the district court relied, courts have traditionally not required plaintiffs to identify an identical "comparator" as a threshold matter in cases based on express statutory classifications.  *See, e.g.*, *Armour* v. *City of Indianapolis*, 132 S. Ct. 2073, 2079-2082 (2012); *Indiana Petroleum Marketers & Convenience Store Association* v. *Cook*, 808 F.3d 318, 322-325 (7th Cir. 2015);[7] *Wisconsin Education Association Council* v. *Walker*, 705 F.3d 640, 653-657 (7th Cir. 2013); *Goodpaster*, 736 F.3d at 1071-1072; *see generally* Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581, 598 (2011) (Shay) (noting that "the U.S. Supreme Court has not historically viewed [the "similarly situated" analysis] as a separate, threshold requirement, but rather as one and the same as the equal protection merits inquiry").  That is no doubt because, in the case of an ex-

---

[7] In fact, in *Indiana Petroleum Marketers*, the chairman of the Indiana Alcohol and Tobacco Commission made precisely the same argument to this Court that he and the other defendants did below:  namely, that the Equal Protection Clause did not have "application to [the] case" because the plaintiffs had not identified a "comparator."  *See* Br. of Appellee at 29-32, *Indiana Petroleum Marketers* (Nov. 21, 2014) (citing "class of one" cases).  Although this Court ultimately held that the challenged classification survived rational-basis review, it did not accept the chairman's argument for avoiding rational-basis review altogether.

24

press statutory classification, there is no question that the disparate treat-
ment is related to the plaintiff's membership in the statutory class. Courts
do not need to compare the plaintiff's treatment to the treatment of a similar-
ly situated individual in order to ferret out the reason for the disparate
treatment; on its face, the disparate treatment is based on the plaintiff's
membership in the class.

In cases involving express statutory classifications, therefore, the ques-
tion whether the plaintiff is being treated differently from someone else who
is "similarly situated" necessarily collapses into the substantive equal-
protection inquiry. As the Supreme Court put it in *Plyler* v. *Doe*, 457 U.S.
202 (1982):

> The initial discretion to determine what is "different" and what is "the
> same" resides in the legislatures of the States. A legislature must have
> substantial latitude to establish classifications that roughly approxi-
> mate the nature of the problem perceived, that accommodate compet-
> ing concerns both public and private, and that account for limitations
> on the practical ability of the State to remedy every ill. In applying the
> Equal Protection Clause to most forms of state action, we thus seek on-
> ly the assurance that the classification at issue bears some fair rela-
> tionship to a legitimate public purpose.

*Id.* at 216. Put another way, whether the plaintiff and the person treated dif-
ferently are "similarly situated" must necessarily be viewed in light of the
state interest justifying the difference in treatment—that is to say, as part of

the substantive equal-protection analysis.[8]

d.    The district court's opinion in this case aptly illustrates the problems with treating the "similarly situated" inquiry as a threshold inquiry separate from the substantive equal-protection analysis in cases involving express classifications.  The district court held that Monarch and other beer wholesalers are not similarly situated with wine wholesalers—which *are* eligible to become liquor wholesalers—because of the statutory "franchise protections" protecting beer wholesalers from unlawful termination by beer manufacturers.  App. 10-11.  Defendants invoked those same franchise protections in support of their argument that the prohibition on joint wholesaling is rationally related to legitimate state interests.  Oddly, however, the district court expressly declined to decide as part of its substantive equal-

---

[8] As one commentator has explained:

> In cases regarding express categories, no matter the level of equal protection scrutiny applied, the focus of the "similarly situated" analysis is substantially the same as the key inquiry of equal protection review: Does the legislative classification bear a close enough relationship to the purpose of the statute?  While courts and litigants may disagree about whether individuals really are "similarly situated" with respect to a statutory purpose, the analysis, properly understood, is another way of describing the substantive equal protection inquiry.

Shay 588 (footnote omitted).  By contrast, the same commentator observed, "equal protection plaintiffs in cases that do not involve express categorizations, such as selective prosecution claims, must first demonstrate that other 'similarly situated' individuals were treated differently."  *Id.* at 587-588.

protection analysis whether "the existence of the 'franchise protections' granted only to beer wholesalers would be a sufficient justification for prohibiting beer wholesalers from also engaging in liquor wholesaling." App. 18 n.9. But if the franchise protections do *not* justify the disparate treatment of beer wholesalers and other persons without such protections, then they cannot possibly render beer wholesalers dissimilarly situated to such other persons in any relevant way.[9]

Simply put, in cases where a statute draws an express classification between two classes, the inquiry is always whether the classification "bear[s] a rational relationship to some legitimate end." *Goodpaster*, 736 F.3d at 1071 (citation omitted). If it does, then the two classes are not similarly situated for purposes of the Equal Protection Clause. If it does not, then the two classes are similarly situated and the classification cannot stand. And as Monarch will demonstrate below, Indiana's express classification between beer wholesalers and other persons has no rational relationship to any legitimate interest, and it is therefore invalid.

---

[9] Even if this Court were to conclude that the member of an express statutory class must identify a similarly situated "comparator" as a threshold matter in every equal-protection case, Monarch submits that beer wholesalers are similarly situated with non-beer wholesalers in all material respects, because neither the franchise protections nor any other feature of beer wholesalers justifies the disparate treatment. *See* pp. 34-52, *infra.*

### 2. The Mere Fact That A Person Must Choose To Become A Beer Wholesaler Does Not Immunize Indiana's Disparate Treatment From Equal-Protection Review

a.     In the district court, defendants argued that Indiana's disparate treatment of beer wholesalers is immune from equal-protection review for another reason.  According to defendants, because Indiana's statutory scheme permits persons to choose to become *either* a beer wholesaler *or* a liquor wholesaler, all persons are treated the same *ex ante*.  Therefore, defendants urged, the fact that beer wholesalers as a class are denied a benefit available to all other persons after making that choice is immaterial to the Equal Protection Clause.

Defendants' argument for avoiding equal-protection review is just as flawed as the district court's approach, and this Court should similarly reject it.  To begin with, defendants cited no authority below for the proposition that a plaintiff cannot challenge on equal-protection grounds discriminatory treatment of a class of individuals that the plaintiff voluntarily joined.  To the contrary, particularly in the context of economic regulation, courts routinely engage in equal-protection review of laws that discriminate against classes that plaintiffs voluntarily joined.

For example, in *Indiana Petroleum Marketers*, this Court recently reviewed provisions of the Indiana Alcoholic Beverages Law that prohibit grocery and convenience stores from selling cold packaged beer but that permit

package liquor stores to do so.  *See* 808 F.3d at 320.  Of course, from an *ex ante* perspective, the statute treats all persons the same:  a person may choose either to become a package liquor store and sell cold beer, or to become a grocery and convenience store and be prohibited from selling cold beer.  But the mere fact that all persons have the same *ex ante* choice did not shield Indiana's disparate treatment of grocery and convenience stores from equal-protection review.

Similarly, in *Vance* v. *Bradley*, 440 U.S. 93 (1979), the plaintiffs challenged the constitutionality under the Equal Protection Clause of a statute that required foreign-service employees, but not civil-service employees, to retire at the age of 60.  *See id.* at 94.  The plaintiffs claimed that the statute discriminated against foreign-service employees as compared to other government employees.  *See id.* at 96 n.10.  Of course, the statute did not force persons to become foreign-service employees.  The decision to apply to become a foreign-service employee, as opposed to a civil-service employee, is a wholly voluntary one.  But the Supreme Court did not hold that the prohibition was immune from equal-protection review on the theory that all persons had the same *ex ante* choice.  Instead, the Court reviewed the classification under the Equal Protection Clause and concluded that it satisfied rational-basis review.  *Id.* at 98-112; *see also, e.g.*, *Goodpaster*, 736 F.3d at 1071-1072 (examining under the Equal Protection Clause the disparate treatment of

bars and tobacco-specialty bars); *Burrows* v. *Ohio High School Athletic Association*, 891 F.2d 122, 126 (6th Cir. 1989) (examining under the Equal Protection Clause a prohibition that resulted from students' voluntary choice to play on both school and independent athletic teams).

If accepted, defendants' position would virtually foreclose equal-protection review of discriminatory burdens imposed on classes in which membership is voluntary rather than innate. Almost any law imposing such a restriction could be characterized as giving "all" persons the same *ex ante* choice. The Court should reject defendants' attempt to immunize from review a law that, by its plain text, identifies a class of persons and denies them a privilege available to everyone else. *See* Ind. Code § 7.1-5-9-3(b) (providing that "[i]t is unlawful for the holder of a . . . beer wholesaler's permit to have an interest in a liquor permit of any type under this title").

b.    Defendants suggested below that there is something special about the choice presented by the statutory provisions at issue here, which effectively prohibit entities from simultaneously holding two different permits. That position also finds no support in the law. Courts have applied equal-protection scrutiny to statutes that prohibit individuals from seeking or accepting one government office while holding another government office. *See Clements* v. *Fashing*, 457 U.S. 957, 966-969 (1982) (plurality opinion);

*Arceneaux* v. *Treen*, 671 F.2d 128, 133 (5th Cir. 1982).[10]  If accepted, defendants' position would permit States irrationally to deny a class of persons a privilege simply because they have chosen to accept some other privilege, free from the constraints of equal-protection review.

Under defendants' logic, a legislature could pass laws prohibiting persons holding a fishing license from obtaining a driver's license; barring persons with a cosmetologist's license from becoming licensed foster parents; or forbidding welfare recipients from also attending a state-funded community college—and persons burdened by those laws would have no recourse to the Equal Protection Clause simply because they, together with all other persons, had the same *ex ante* choice.  That cannot be the law.  Those restrictions would be subject to equal-protection review—leaving aside whether they could survive it—because they contain facial classifications and distribute burdens based on those classifications.

c.     In a recent opinion involving a claim by Monarch under the Indiana Equal Privileges and Immunities Clause, the Indiana Court of Appeals adopted a variant of defendants' argument.  *See Monarch Beverage Co.* v.

---

[10] In fact, in *Arceneaux*, a concurring judge argued that the prohibition on dual employment did not even trigger equal-protection review, much like defendants argued below.  *See* 671 F.2d at 136-137 (Goldberg, J., concurring). But the court conducted an equal-protection review, concluding that the prohibition satisfied the rational-basis test.  *See id.* at 131-134.

*Cook*, No. 49A02-1504-PL-245, ___ N.E.3d ___, 2015 WL 9197720 (Ind. Ct. App. Dec. 17, 2015).  The court concluded that Monarch was not treated differently from anyone else because

> all persons who seek to obtain a wholesaler's permit from the Commission are treated equally and have an equal opportunity to choose to become either a beer wholesaler or a liquor wholesaler, and after a choice has been made, beer and liquor wholesalers are equally prohibited from acquiring a permit to distribute any other alcohol except for wine.

*Id.* at *5-*6 (emphases omitted).  As a preliminary matter, Indiana courts construe the Equal Privileges and Immunities Clause independently from the federal Equal Protection Clause.  *See Collins* v. *Day*, 644 N.E.2d 72, 75 (Ind. 1994).  As a result, the court's decision rested on state law and has no bearing here.

But even if the Indiana Court of Appeals' decision were relevant to Monarch's federal constitutional claim, this Court should reject its conclusory reasoning.  As explained above, virtually any statutory discrimination against a class with voluntary membership could be recast as giving everyone an "equal opportunity to choose," *Monarch Beverage*, 2015 WL 9197720, at *6 (emphasis omitted), but courts have never before held that sufficient to protect the discrimination from judicial review.  And the mere fact that a law imposes symmetric but separate burdens on distinct classes of entities (here, beer wholesalers and liquor wholesalers) after a choice is made similarly does not shield those burdens from review.

At bottom, the Indiana Court of Appeals reasoned that the statute does not discriminate against beer wholesalers because there is no entity that is a beer wholesaler and also a liquor wholesaler. *See Monarch Beverage*, 2015 WL 9197720, at *6. But that, of course, is precisely the consequence of the disparate treatment created by the statute, which prohibits *all* beer wholesalers from becoming liquor wholesalers. At least one court of appeals has rejected such circular reasoning as "frivolous." *See Totes-Isotoner Corp.* v. *United States*, 594 F.3d 1346, 1351 (Fed. Cir. 2010) (noting that "[e]qual protection requirements still apply even though everyone in the targeted group is targeted equally").

In sum, the express classification drawn by the challenged provisions of the Indiana Alcoholic Beverages Law is no different from the many other classifications that courts routinely scrutinize under the Equal Protection Clause. Indiana has created a benefit—the ability to apply for and obtain a liquor wholesaler's permit—and has denied that benefit to one statutorily defined class of persons: beer wholesalers. The fact that Indiana has imposed symmetric restrictions on beer wholesalers and liquor wholesalers may be relevant in assessing the justifications for the restriction, but it does not immunize the statutory classification from review altogether.

## B. Indiana's Disparate Treatment Of Beer Wholesalers Is Not Rationally Related To Any Legitimate State Interest

The Equal Protection Clause demands that legislative classifications "rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Johnson* v. *Robison*, 415 U.S. 361, 374 (1974) (citation omitted). To be sure, where a classification does not involve suspect classes or fundamental rights, a court must uphold the classification as long as it appears rational in light of the legislature's goals. *See, e.g., FCC* v. *Beach Communications, Inc.*, 508 U.S. 307, 313-314 (1993). But rational-basis review is not "toothless." *Sutker* v. *Illinois State Dental Society*, 808 F.2d 632, 634 (7th Cir. 1986) (quoting *Mathews* v. *Lucas*, 427 U.S. 495, 510 (1976)). The classification must have a "plausible reason[]," *Beach Communications*, 508 U.S. at 313-314 (citation omitted), and "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational," *City of Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985) (citing, *inter alia, United States Department of Agriculture* v. *Moreno*, 413 U.S. 528, 535 (1973)).[11]

---

[11] The district court stated that courts apply an "even more indulgent" version of rational-basis review "[w]hen dealing with a local economic regulation." App. 12-13. But that proposition finds no support in the case law. The court purported to derive that proposition from *Goodpaster, supra*. There, however, this Court articulated and applied the same rational-basis test that applies to all equal-protection claims that do not involve suspect classes or fundamental rights. *See* 736 F.3d at 1071.

In defending a legislative classification, States are not limited to the actual purpose of the classification. *See Beach Communications*, 508 U.S. at 315. States may offer hypothetical justifications, but those justifications must still be supported by "rational speculation." *Id.* The proffered justification must have "some footing in the realities of the subject addressed by the legislation." *Wisconsin Education Association Council*, 705 F.3d at 653 (citation omitted). A court need not indulge justifications that are mere "fantasy." *St. Joseph Abbey* v. *Castille*, 712 F.3d 215, 223 (5th Cir.), *cert. denied*, 134 S. Ct. 423 (2013). And "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption." *Id.* at 226; *see also Smith*, 457 F.3d at 652 (explaining that the actual purpose "may be relevant but is not dispositive in the application of rationality review").

Even if the State offers a legitimate justification for a classification, the Equal Protection Clause further requires that the classification bear a rational relationship to that justification. The fit between means and end need not be precise. *See City of New Orleans* v. *Dukes*, 427 U.S. 297, 303 (1976) (per curiam). But courts' deference under rational-basis review is not absolute. The State may not adopt "ludicrously ineffectual" means of advancing legitimate justifications, *Plyler*, 457 U.S. at 228 (citation omitted), nor may the State offer hypothetical justifications whose relationship to the classifica-

35

tion is "so attenuated as to render the distinction arbitrary or irrational," *City of Cleburne*, 473 U.S. at 446; *see also Christian Heritage Academy* v. *Oklahoma Secondary School Activities Association*, 483 F.3d 1025, 1033 (10th Cir. 2007) (collecting Supreme Court cases invalidating classifications where there was "an inadequate or a nonexistent connection between the classification and purpose"). As this Court has explained, "[i]t is no answer to say that a state does not violate the Equal Protection Clause merely because the classifications made by its law are imperfect when these classifications cannot be shown even to be rationally related to the objective the state is attempting to achieve." *Gault* v. *Garrison*, 569 F.2d 993, 996 (7th Cir. 1977) (citation and internal quotation marks omitted).

As set forth above, the *actual* purpose of Indiana's unique law prohibiting beer wholesalers from holding liquor wholesale permits was to create separate sources of patronage for state and county politicians. *See* pp. 6-9, *supra*. Defendants did not dispute the evidence of that purpose below, and they wisely did not argue that political patronage is a legitimate state objective. *See Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983). Instead, in the proceedings below and in state-court proceedings involving the same classification, defendants have cycled through a series of hypothetical justifications for the classification. In each instance, the relationship between the proffered justification and Indiana's

36

antiquated prohibition is so attenuated and irrational as to render the prohibition arbitrary under the Equal Protection Clause.

### 1. The Challenged Prohibition Is Not Rationally Related To The State's Claimed Interest In Limiting Alcohol Consumption

Defendants argued below, and the district court agreed, that the prohibition on joint wholesaling serves to advance Indiana's interest in limiting alcohol consumption. As the district court explained it, "Indiana restricts beer wholesalers from obtaining liquor permits in order to maintain certain minimum prices for alcoholic products, reasoning that increased competition from beer wholesalers could depress liquor prices, leading to increased liquor consumption, addiction, and other societal ills." App. 14. Monarch does not dispute that preventing excessive alcohol consumption is a legitimate state interest. But the district court's conclusion that Indiana's disparate treatment of beer wholesalers advances that interest defies plausibility.

a. Although States may make "rational distinctions . . . with substantially less than mathematical exactitude," *Dukes*, 427 U.S. at 303, courts appropriately have been "suspicious of a legislature's circuitous path to legitimate ends when a direct path is available." *Craigmiles* v. *Giles*, 312 F.3d 220, 227 (6th Cir. 2002) (citing *City of Cleburne*, 473 U.S. at 439). For example, in *Moreno*, *supra*, the Supreme Court expressed skepticism that a statute excluding unrelated persons living in the same household from the

federal food-stamp program could rationally have been intended to prevent fraud when the law "itself contain[ed] provisions, wholly independent of [the challenged provision], aimed specifically at the problems of fraud." 413 U.S. at 536. The Court concluded that, "in practical effect, the challenged classification simply does not operate so as rationally to further the prevention of fraud," and that it therefore violated the Equal Protection Clause. *Id.* at 537.

The Indiana Alcoholic Beverages Law provides compelling reason to be skeptical that Indiana's disparate treatment of beer wholesalers is rationally related to an interest in maintaining high alcohol prices in order to discourage consumption. The Alcoholic Beverages Law contains provisions specifically aimed at raising alcohol prices: namely, the provisions imposing excise taxes. *See* Ind. Code §§ 7.1-4-2-1, 7.1-4-3-1, 7.1-4-4-1. Expert commentary produced by defendants in support of their motion for summary judgment specifically recognizes excise taxes as a means of raising alcohol prices in order to lower consumption. *See* D. Ct. Dkt. 81-5, at 45; D. Ct. Dkt. 81-5, at 65. But it is undisputed that Indiana's taxes are among the lowest in the country. *See* D. Ct. Dkt. 95-1, at 271, 312; D. Ct. Dkt. 95-2, at 109; D. Ct. Dkt. 95-19, 95-20, 95-21.

Indiana has also eschewed other means of price regulation advocated by alcohol experts, such as prohibiting volume discounts or requiring minimum mark-ups at the wholesaler or retailer/dealer level. *See* D. Ct. Dkt. 81-

5, at 10; D. Ct. Dkt. 95-24, at 29, 32; pp. 10-11, *supra*.  To the extent the Alcoholic Beverages Law addresses prices, it actually permits wholesalers to reduce prices in some circumstances.  For example, wholesalers are permitted to use volume discounts, Ind. Code § 7.1-5-5-7, and wholesalers may reduce, but not raise, prices after disseminating them to retailers/dealers, D. Ct. Dkt. 95-1, at 320-321.

As in *Moreno*, the existence of all of these direct means of regulating prices—and Indiana's policy choice to forgo such regulation—casts considerable doubt on the district court's conclusion that the at-issue prohibition (which defendants did not dispute was *actually* born of an illegitimate motive) could rationally be thought to raise liquor prices.  It is no wonder that defendants' counsel conceded during the proceedings below that eliminating the challenged prohibition would have "very little economic impact on the State of Indiana" and would "not have any major impact on Indiana beyond its alcohol wholesalers."  App. 46.

That Indiana is the only State with a prohibition of this variety only further calls into doubt the notion that the prohibition serves the purpose of maintaining prices.  Of course, Indiana need not conform its practices to those of other States to satisfy rational-basis review.  But, at a minimum, this Court may consider the unorthodox nature of Indiana's prohibition in assessing whether it rationally serves legitimate state interests.  *See Romer* v.

*Evans*, 517 U.S. 620, 633 (1996).  Courts may look to the practices of other jurisdictions in assessing whether the means a State has chosen are rationally adapted to its ends.  *See, e.g.*, *Turner* v. *Safley*, 482 U.S. 78, 97-98 (1987).

The district court dismissed these arguments as "[un]sound judicial analysis."  App. 15.  According to the court, "Indiana may not have chosen the 'best way' to ensure high prices for alcohol and to realize its public policy goals, but the State is not required to choose the best or wisest way to regulate industry."  App. 16 (citation omitted).  As far as it goes, of course, that statement is true.  But it does not follow that Indiana's decision to eschew traditional means of regulating alcohol prices is entirely irrelevant.  That decision exposes just how "attenuated" the relationship is between Indiana's unique prohibition on a beer wholesaler's holding a liquor wholesale permit, on the one hand, and the State's asserted interest in increasing alcohol prices in order to limit consumption, on the other.  *City of Cleburne*, 473 U.S. at 446; *see also Wisconsin Education Association Council*, 705 F.3d at 653 (requiring that the proffered reason have "some footing in the realities of the subject addressed by the legislation" (citation omitted)).  As a matter of common sense, it is simply implausible that a law prohibiting beer wholesalers from distributing liquor could have been motivated by a desire to maintain high alcohol prices when Indiana has elected not to pursue any of the familiar means of controlling prices directly.

40

c.     The "circuitous" nature of defendants' price-maintaining theory further confirms its implausibility.  *See Craigmiles*, 312 F.3d at 227.  On its face, the challenged prohibition has nothing to do with alcohol prices.  Defendants' theory rests on a multi-step hypothetical causal chain, with each step ever more speculative than the previous one.  According to defendants, if beer wholesalers were permitted to compete in the liquor market, they could leverage their franchise protections in the beer market to maintain artificially high beer prices in order to subsidize their efforts to break into the liquor market by offering lower prices on liquor.  Those lower liquor prices would, in turn, increase consumption of liquor.

Defendants' theory fails on two fronts.  *First*, that theory could not possibly have motivated the General Assembly in 1935, for the simple reason that the franchise protections did not exist at that time.  In fact, the prohibition on joint wholesaling had been in place *for decades* by the time Indiana first enacted franchise protections for beer wholesalers in 1965.  *See* 1965 Ind. Acts 658, 659, § 2; Pub. L. 224-2005, 2005 Ind. Acts 3624, 3636, § 19.  Given the multi-decade gap between when the prohibition was enacted and when the alleged justification for the prohibition arose, the required "link between classification and objective" is missing.  *Romer*, 517 U.S. at 632; *cf. Zobel* v. *Williams*, 457 U.S. 55, 61-62 (1982) (concluding that a classification

41

could not have incentivized individuals' behavior before the classification was enacted).

If anything, moreover, the historical evidence demonstrates that, in 1935, the Indiana General Assembly was concerned that liquor prices were too high—not that they were too low. As discussed above, reformers at the time advocated *lowering* liquor prices to eliminate bootlegging. *See* p. 10, *supra*. There is no support in the historical record for the notion, advanced by defendants below, that the General Assembly adopted the restraint on beer wholesalers to ensure that liquor prices remained *higher*.

*Second*, even if they could be relevant to support a prohibition enacted in 1935, Indiana's franchise protections for beer wholesalers would not permit beer wholesalers to cut liquor prices if they were to enter that market. Defendants' contrary argument misstates the effect of the franchise protections, which shield beer wholesalers only from predatory behavior by their *suppliers*. *See* Ind. Code §§ 7.1-3-25-1 to 7.1-3-25-15, 7.1-5-5-9(c). They do not protect beer wholesalers from competition in the marketplace. As the record demonstrates, major beer suppliers (such as Anheuser-Busch and MillerCoors) refuse to use the same wholesalers. *See* D. Ct. Dkt. 95-1, at 291-292. As a practical matter, therefore, a wholesaler such as Monarch that distributes for MillerCoors is precluded from distributing for Anheuser-Busch—and faces competition from other wholesalers that do.

Because beer wholesalers compete with other beer wholesalers, the notion that beer wholesalers could maintain artificially inflated beer prices in order to lower their prices on liquor is pure "fantasy." *See St. Joseph Abbey*, 712 F.3d at 223. Any beer wholesaler that attempted such a strategy would quickly lose beer business to a competing wholesaler offering more favorable prices. Notably, although franchise protections for beer wholesalers exist in nearly every State, *see* Tamayo 2205, there is no evidence that franchise protections have undermined the price of liquor in those States. That is true even though no other State with private distribution of beer and liquor prohibits its beer wholesalers from distributing liquor as well.

Finally on this point, the State's argument that beer wholesalers could leverage their franchise protections to undercut prices and seize business in the liquor market is flatly contradicted by Indiana's experience with wine. Beer wholesalers are eligible to apply for and obtain permits to distribute wine in Indiana, yet they have not used their beer franchise protections to take over the wine market by undercutting prices. To the contrary, liquor wholesalers distribute the majority of wine in Indiana. *See* D. Ct. Dkt. 95-23. That Indiana permits beer wholesalers to distribute wine, but prohibits them from distributing liquor, casts even greater doubt on defendants' assertion that the prohibition is intended to prevent beer wholesalers from leveraging

their franchise protections in order to take over a market that does not have such protections.

2.   **The Challenged Prohibition Is Not Rationally Related To The State's Claimed Interest In Encouraging Competition Among Wholesalers**

a.   Defendants' second rationale for Indiana's disparate treatment of beer wholesalers is equally "attenuated" from the challenged restriction. *City of Cleburne*, 473 U.S. at 446. Defendants argued below, and the district court agreed, that a legislature could rationally believe that, if beer wholesalers were permitted to distribute liquor, they would force existing liquor wholesalers out of business, thus decreasing competition in the wholesale tier. To state the obvious, defendants' theory that permitting beer wholesalers to distribute liquor would lead to market concentration in the liquor market is deeply in tension with their other theory that lifting the restraint would cause alcohol prices to fall. It is an economic truism that, where a company holds market power, it will extract anticompetitive prices. *See, e.g.*, Richard A. Posner, *Antitrust Law* 9 (2d ed. 2001). If beer wholesalers were able to leverage their franchise protections to decrease competition in the liquor wholesaler market, one would expect liquor prices to rise (and consumer demand to fall). But defendants posited the very opposite scenario as part of their first hypothetical justification. Defendants cannot prevail by offering justifications that are flatly contradictory. *See Merrifield* v. *Lockyer*, 547

44

F.3d 978, 991 (9th Cir. 2008). Even deferential rational-basis review does not permit defendants to win with the argument that a law will either raise prices, lower prices, or—as defendants' counsel previously conceded was the case—have no effect on prices at all. *See* App. 46. That argument—that defendants win if the coin lands heads, tails, or on its end—is the very definition of irrationality.

b.     In any event, the theory that permitting beer wholesalers to distribute liquor would drive liquor wholesalers out of business is not supported by even "rational speculation." *Beach Communications*, 508 U.S. at 315. As explained above, a legislature could not rationally believe that beer wholesalers would be able to leverage their franchise protections in the beer market to undercut liquor wholesalers' prices and steal their business. *See* pp. 41-44, *supra*. Moreover, Indiana's liquor wholesalers maintain exclusive, statewide distribution arrangements with suppliers. *See* D. Ct. Dkt. 95-23. As a practical matter, those relationships would make it difficult for a beer wholesaler to penetrate the liquor market unless it had a preexisting relationship with a supplier, as Monarch does with Gallo. As it stands, the liquor-distribution industry in Indiana is dominated by a few large national distributors. *See* D. Ct. Dkt. 95-2, at 45; D. Ct. Dkt. 95-3, at 107. Permitting beer wholesalers to enter the liquor market to compete with such entrenched incumbents is likely to disrupt oligopolistic conditions, not to create them. Particularly under

45

those conditions, a legislature could not rationally believe that permitting *more* competition in the liquor wholesale market would *decrease* competition.

The district court seemingly recognized that defendants' competition-decreasing theory turned on the existence of the franchise protections for beer wholesalers, *see* App. 16, but the court expressly declined to consider the *effect* of those protections, *see* App. 18 n.9. Instead, the court uncritically accepted defendants' assertion that "beer wholesalers would . . . have the power to eliminate the current liquor wholesalers, if they were allowed to enter the liquor market," App. 16, without actually analyzing whether a legislature could plausibly believe that to be so. For all the reasons previously stated, because the franchise protections do not protect beer wholesalers from competition in the marketplace, they provide no reason to conclude that beer wholesalers could leverage those protections to drive liquor wholesalers out of business.[12]

The district court also chastised Monarch for highlighting the "market realities" of the liquor-distribution market. App. 17 (citation omitted). But

---

[12] Defendants also speculated below that Monarch could enter the liquor market without significantly increasing its overhead, which, according to defendants, would permit Monarch to push incumbent liquor wholesalers out of the market. But the testimony on which this argument was based was simply that Monarch could begin distributing *Gallo's* modest line of four liquor products without a significant increase in overhead. *See* D. Ct. Dkt. 95-3, at 99, 108-110. The notion that a beer wholesaler could take over a substantial part of the liquor market without increasing overhead is implausible.

46

the fact that defendants need not cite empirical evidence in support of hypothetical justifications does not mean that evidence of market realities is irrelevant.  In determining whether a challenged classification has a rational basis, courts may take account of how the classification works "in practical operation."  *Moreno*, 413 U.S. at 538.  And in practical operation, as discussed above, the provisions of the Indiana Alcoholic Beverages Law prohibiting beer wholesalers from distributing liquor have had the entirely predictable effect of *diminishing* competition in the liquor-distribution market.  That simply confirms the obvious:  a provision that keeps entities out of a marketplace could not rationally be thought to advance an interest in increasing competition.

### 3.     *The Challenged Prohibition Is Not Rationally Related To Any Other Legitimate State Interest*

In a recent Indiana state-court appeal involving a claim by Monarch under the Indiana Equal Privileges and Immunities Clause, defendants abandoned their economic justifications for Indiana's disparate treatment of beer wholesalers in favor of a new set of hypothetical justifications.  But those justifications are just as far removed from the prohibition as defendants' economic justifications.

a.     To begin with, defendants argued that the Indiana General Assembly could have prohibited beer wholesalers from holding liquor-distribution permits out of concern about liquor's higher alcohol content.

47

Harking back to the wake of Prohibition, defendants observed that temperance advocates urged more stringent controls of intoxicating liquor, believing that it posed a greater danger to public health and morals than did beer and wine.  Contrary to defendants' premise, however, Indiana law if anything treats beer wholesalers *more* restrictively than liquor wholesalers.  Beer wholesalers must make an initial investment of at least $15,000 in their business, *see* Ind. Code § 7.1-3-3-2; may have only one warehouse, *see id.* § 7.1-3-3-4; must occupy leased premises for the full term of their permit, *see id.* § 7.1-3-3-3; and may hold only one permit, *see id.* §§ 7.1-3-3-4, 7.1-5-9-4.  Liquor wholesalers have no similar burdens.

In any event, the challenged prohibition does not impose more stringent controls on the distribution of liquor; it simply disqualifies one class of persons from becoming liquor wholesalers.  Defendants were unable to draw any rational connection between the prohibition and any interest in limiting the distribution of liquor.  The most defendants could do was to point to a number of other States that also separate control of beer and liquor at the wholesale level.  But those States all distribute liquor through state-run monopolies, while permitting private companies to distribute beer.  The States that adopted that system did so at the recommendation of two researchers who published an influential study as Prohibition was coming to an end.  Those researchers recommended establishing state-run monopolies in order

48

to eliminate the profit motive from the distribution of liquor. *See* Fosdick & Scott 37-48. But any similarity between those systems and Indiana's is superficial at best. Indiana's unique prohibition is obviously not intended to eliminate the profit motive from the distribution of liquor. To the contrary, the prohibition has permitted Indiana's liquor distributors to flourish, insulated from competition by beer wholesalers.

b. Second, defendants argued that the prohibition served Indiana's interest in preventing a return to the "tied houses" that plagued the pre-Prohibition era. As discussed above, "tied houses" were retail establishments that agreed to sell the products of only one brewer or distiller. Fosdick & Scott 29. Temperance advocates blamed the tied houses for excessive consumption, arguing that the manufacturers that controlled the tied houses "knew nothing and cared nothing about the community" and were concerned solely with "increased sales." *Id.*

Monarch does not dispute that Indiana has an interest in prohibiting "tied houses." As previously discussed, Indiana, like all of the other States, responded to that very concern by enacting a three-tier system and prohibiting vertical integration across the tiers. *See* pp. 2-3, *supra*. But defendants made no effort in the state-court proceedings to explain how a prohibition on *horizontal* integration within the wholesale tier could be viewed as serving an

interest in preventing *vertical* integration between retailers and manufacturers. The two concepts simply have nothing to do with each either.

In a variant of the same argument, defendants asserted that prohibiting beer wholesalers from entering the liquor market serves to prevent wholesalers from obtaining a dominant position in the middle tier of the market and exerting undue influence over retailers/dealers. But as discussed above, defendants' theory that permitting beer wholesalers to compete with liquor wholesalers would result in less competition and more market concentration lacks any "footing in the realities of the subject addressed by the legislation." *Wisconsin Education Association Council*, 705 F.3d at 653 (citation omitted); *see* pp. 44-47, *supra*. And as also discussed above, Indiana law already protects retailers/dealers from undue influence by wholesalers. *See* pp. 3-4, *supra*. "The existence of these provisions necessarily casts considerable doubt upon the proposition that the [prohibition on joint wholesaling] could rationally have been intended to prevent those very same abuses." *Moreno*, 413 U.S. at 536-537.

c.    Finally, defendants argued that the prohibition serves the modern-day goals of preventing upheaval in the liquor-distribution market, boldly arguing that, "if the legislature likes the status quo, it should be permitted to keep the status quo." That was nothing more than a thinly disguised plea for allowing defendants to protect the economic interests of Monarch's com-

petitors at Monarch's expense.  And it exposes what defendants' defense of this illegitimate and obsolete prohibition is really about:  as a bipartisan legislative committee recently concluded, "Indiana's alcohol laws have demonstrated a []consistency of inconsistency whereby alcohol policy has been driven by the monetary gains or losses of varying sectors within the three-tier system as opposed to maintenance of a uniform regulatory policy consistent with the general purposes enacted in 1973."  D. Ct. Dkt. 95-18, at 25.

Whatever the dubious merits of defendants' position as a matter of state constitutional law, their position is completely at odds with the federal Equal Protection Clause.  Protecting the economic interests of favored actors such as liquor wholesalers is not a legitimate state interest.  *See, e.g.*, *Energy Reserves Group*, 459 U.S. at 412; *Merrifield*, 547 F.3d at 991 & n.15; *Craigmiles*, 312 F.3d at 228.  And it goes without saying, or at least it should, that the Equal Protection Clause does not permit the State to maintain an unconstitutional status quo simply because it likes the status quo.

\*    \*    \*    \*    \*

This Court should reject defendants' far-fetched justifications for a prohibition that even defendants do not dispute was actually motivated by the most troubling of reasons.  There is simply no rational connection between the challenged prohibition and the ever-evolving hypothetical state interests offered by defendants.  Defendants' struggles to articulate a valid

justification expose the prohibition for what it actually is:  a restraint that was illegitimate at its birth and today serves no purpose other than to protect politically powerful liquor wholesale interests from competition.  Every so often, "a case comes along when [a] [c]ourt needs to say enough is enough, if the Equal Protection Clause is to retain any force in this context."  *Armour*, 132 S. Ct. at 2087 (Roberts, C.J., dissenting).  We respectfully submit that this is that case.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

   /s/ Kannon K. Shanmugam

RICHARD A. SMIKLE
DEREK R. MOLTER
ICE MILLER LLP
 *One American Square, Suite 2900*
 *Indianapolis, IN 46282*


JANUARY 8, 2016

KANNON K. SHANMUGAM
AMY MASON SAHARIA
ALLISON B. JONES
KATHERINE MORAN MEEKS
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *(202) 434-5000*

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,835 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and 7th Cir. R. 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point font.

     /s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

JANUARY 8, 2016

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellant and a member of the Bar of this Court, certify that, on January 8, 2016, copies of the attached Brief of Appellant, Short Appendix, and Separate Appendix were filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

# SHORT APPENDIX

# TABLE OF CONTENTS

Page

Order on Cross Motions for Summary Judgment
   (D. Ct. Dkt. 113)....................................................................... App. 1

Judgment (D. Ct. Dkt. 114) ................................................. App. 22

## STATEMENT OF COUNSEL

I, Kannon K. Shanmugam, counsel for appellant and a member of the Bar of this Court, certify that all of the materials required by 7th Cir. R. 30(a) and (b) are included in appellant's Short Appendix and Separate Appendix.


/s Kannon K. Shanmugam
KANNON K. SHANMUGAM

JANUARY 8, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MONARCH BEVERAGE CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01674-SEB-MJD |
| | ) | |
| DALE  GRUBB in his official capacity as | ) | |
| Commissioner of the Indiana Alcohol and | ) | |
| Tobacco Commission, | ) | |
| DAVID  COOK In his official capacity as the | ) | |
| Chairman of the Indiana Alcohol and Tobacco | ) | |
| Commission, | ) | |
| DAVID  COLEMAN In his official capacity as | ) | |
| the Vice Chairman of the Indiana Alcohol and | ) | |
| Tobacco Commission, | ) | |
| MARJORIE  MAGINN In her official capacity | ) | |
| as the Commissioner of the Indiana, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |
| | ) | |
| INDIANA BEVERAGE ALLIANCE, | ) | |
| WINE & SPIRITS DISTRIBUTORS OF | ) | |
| INDIANA, | ) | |
| | ) | |
| Amicus. | ) | |
| | ) | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the parties' cross motions for summary

judgment. On October 21, 2013, Plaintiff Monarch Beverage Co., Inc. ("Monarch")

brought this action against Defendants in their official capacities, pursuant to 42 U.S.C. §

1983, alleging that certain provisions of the Indiana Code regulating the wholesale

distribution of alcohol violate the Equal Protection Clause of the Fourteenth Amendment

of the United States Constitution.[1]   On November 7, 2014, Defendants moved for

summary judgment [Docket No. 79] and on December 9, 2014, Monarch filed a cross

motion for summary judgment [Docket No. 93]. The motions are fully briefed. For the

reasons detailed in this entry, we **GRANT** Defendants' motion for summary judgment

and **DENY** Plaintiff's cross motion for summary judgment.[2]

## Factual Background

I.      **Indiana's Three-Tier Alcohol Regulation System**

Following passage of the 21st Amendment to the Constitution, Indiana, like most

other States, adopted a three-tiered system for regulating the production, distribution, and

sale of alcohol. *See* FTC*, Possible Anticompetitive Barriers to E–Commerce: Wine* 5–7

(July 2003)*,* available at http:// www.ftc.gov/os/2003/07/winereport2.pdf. (visited

September 29, 2015). The first tier consists of brewers, vintners, and distillers who

manufacture alcoholic products.  The second tier is composed of wholesalers who

purchase alcoholic products from the manufacturers and sell them to the retailers and

dealers. The third tier is comprised of retailers and dealers who sell alcoholic products

---

[1] Plaintiff's Complaint names Alex Huskey, David Johnson, Dale Grubb and Melissa Coxey as defendants
in their official capacities. Dkt. 1. However, since the Complaint was filed, Alex Huskey, David Johnson,
and Melissa Coxey have been replaced in their roles in the Indiana Alcohol and Tobacco Commission by
David Cook, David Coleman and Marjorie Maginn. Pursuant to Federal Rule of Civil Procedure 25(d),
the latter are substituted as the official-capacity defendants.
[2] On December 9, 2014, Plaintiff filed a Motion for Oral Argument on Defendants' Motion for Summary
Judgment and Plaintiff's Cross-Motion for Summary Judgment [Docket. No. 96]. Because we are able to
rule based solely on the parties' written submissions, Plaintiff's Motion for Oral Argument is hereby
**DENIED**.

directly to the consumers.[3] Except in certain limited circumstances, no business may operate within more than one tier, *see* Ind. Code §§ 7.1-5-9-9, 10(a), and a state-issued permit is required for every business at any tier—whether as a manufacturer, wholesaler, or retailer of alcohol. *Id.* § 7.1-3 *et seq.*

The focus of this litigation centers on the second tier: the wholesalers. Plaintiff is a wholesaler. Wholesale suppliers are central to the alcohol regulatory system by creating a buffer between manufacturers and retailers, serving as a port of entry for out-of-state alcohol coming to Indiana, facilitating the collection of excise taxes on alcohol, and ensuring that alcohol products are sold only to licensed retailers and dealers.[4] Bedwell Tr. 23:18–25:15; Terry Dep. 147:3–11.

Wholesalers are regulated by the State in several ways. They are prohibited from tying purchases of one type of alcoholic product to purchases of another, from imposing minimum purchase requirements on retailers and dealers, and from entering into exclusivity contracts with them. Ind. Code § 7.1-5-5-7; 905 Ind. Admin. Code 1-5.1-1, 11. In addition, wholesalers must make known in writing their prices to their customers, and those prices must be made available to all retailers and dealers on a

---

[3] Dealers typically include grocery stores, liquor stores and pharmacies that sell alcohol for off-premise consumption. Retailers, on the other hand, typically include bars and restaurants that sell alcohol for on-premises consumption. Ind. Code §§ 7.1-3-9-8, 7.1-3-10-5, 6.

[4] As explained by the General Manager and CEO of Monarch Beverages, "The purpose of the wholesaler is to provide some level of assurance to the State that only licensed wholesalers and dealers are selling to consumers…. That for alcohol to enter the state of Indiana, it has to go through a state-licensed wholesaler. Therefore, the wholesaler becomes the port of entry. We are the ones who receive it, account for it, report to the State as to what alcohol has entered the state. So there can be come transparency; and, therefore, accountability in the system to the State of Indiana for the distribution of alcohol." Terry Dep. 147:3–149:12.

nondiscriminatory basis and adhered to for at least seven days after they are publicized. Ind. Code § 7.1-5-5-7(a); 905 Ind. Admin. Code 1-31-1, 2.

Indiana also regulates the type and number of permits any given wholesaler may hold at any given time. Indiana issues separate permits for the wholesaling of beer, wine, and liquor. Beer wholesale permits are issued on a county-by-county basis, with a limit on the number of wholesale permits that can be issued by any one county based on its population. Ind. Code § 7.1-3-22-2. Wine and liquor permits, on the other hand, are issued statewide without any numerical limitation. *Id.* at §§ 7.1-2-22 *et. seq.* Under "The Prohibited Interest Provisions" of the Indiana Code, Ind. Code §§ 7.1-5-9-3, 4, 6 and 7.1-3-3-19, a wholesaler may possess one of the three individual permits, both a wine and beer permit, or both a wine and liquor permit. A wholesaler may not, however, hold both a beer and a liquor wholesale permit. *Id.* Notwithstanding this limitation, any wholesaler who holds permits for wine and for liquor may also distribute up to a million gallons a year of flavored malt beverages, which are a type of beer. *Id.* §§ 7.1-3-8-3, 7.1-3-13-3(d). Likewise, a wholesaler who holds permits for beer and for wine may distribute brandy and certain cream-based liqueurs. *Id.* §§ 7.1-3-3-5, 7.1- 3-13-3.

Depending on which permit(s) they obtain, wholesalers are subject to various regulations. Specifically, a wholesaler who has obtained a permit for beer receives "franchise protections" that make it unlawful for a manufacturer of beer to cancel or terminate their agreement with them "unfairly and without due regard to the equities of the other party." *Id.* at § 7.1-5-5-9(c). If the wholesaler suspects a violation of these

protections has occurred, it may report such violation to the Alcohol and Tobacco

Commission who is required to investigate and enforce injunctions under the provision.

*Id.* § 7.1-2-3-26. A wholesaler who obtains a permit for wine or liquor, or both, does not

enjoy any such contractual and enforcement protections by the Alcohol and Tobacco

Commission.

## II.     Monarch Beverage Co., Inc.

Monarch Beverage Co., Inc. is a wholesaler of alcohol products in Indiana.

Monarch currently holds state-issued permits for the sale of beer and wine to the first-tier

distributors. Terry Dep. 23:23–24:25. Monarch has been a wholesaler of beer since 1947

and has been a wholesaler of wine since 1976. *Id.* at 25:6–7, 19–22, 37:20–38:8.

Currently, Monarch distributes wine in all 92 counties in Indiana and beer in 89 Indiana

counties, operating as the exclusive wholesaler of MillerCoors beer in 70 of those 89

counties. *Id.* at 55:7–9, 57:1–21, 59:20–25, Defs. Ex. 18. Among its products, Monarch

distributes wine manufactured by E. & J. Gallo Winery ("Gallo Winery"). *Id.* at 46:8–12.

Gallo Winery also manufactures four liquor products, which Monarch represents that it

would like to be authorized to distribute; however, because Monarch has a permit for

wholesales of beer, it may not obtain a permit for wholesales of liquor, pursuant to

Indiana's Prohibited Interest Provisions. Thus, under Indiana law, Monarch is prohibited

from distributing Gallo Winery's liquor products.

Monarch has been openly critical of Indiana's Prohibited Interest Provisions. In

his attempt to have the provisions repealed, Monarch's General Manager and CEO

Phillip Terry has addressed his concerns to approximately 150 members of the General

Assembly. *Id.* at 138:20–140:12. In addition, Monarch has participated in several public

hearings in support of the repeal of the statutes that restrict Monarch's access to

distribution permits and has provided draft legislative proposals that would effect the

repeal of these provisions. *Id.* at 144:2–145:10, 146:21–147:2.

Monarch's suit challenges the constitutionality of Sections 7.1-3-3-19, 7.1-5-9-3,

7.1-5-9-4, and 7.1-5-9-6 of the Indiana Code under the Equal Protection Clause of the

Fourteenth Amendment. See Dkt. 1. We address these issues and claims below.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment should be

granted when the evidence establishes that "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986).  The purpose of summary

judgment is to "pierce the pleadings and to assess the proof in order to see whether there

is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of

material fact exist, the court construes all facts in a light most favorable to the nonmoving

party and draws all reasonable inferences in favor of the nonmoving party. *See id.* at 255.

However, neither the "mere existence of some alleged factual dispute between the

parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the

material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment.

*Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Courts often confront cross motions for summary judgment because Rules 56(a)

and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to

move for such relief.  In such situations, courts must consider each party's motion

individually to determine if that party has satisfied the summary judgment standard.  *Kohl*

*v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Thus, the Court has

considered the parties' respective memoranda and the exhibits attached thereto, and has

construed all facts and drawn all reasonable inferences therefrom in the light most

favorable to the respective nonmovant. *Matsushita,* 475 U.S. at 574. The parties before

us, by filing cross motions, stipulate that there are no material facts in controversy and

that their dispute is ripe for decision on summary judgment.

### <u>Discussion</u>

### I.      **Requirements of an Equal Protection Challenge**

"The Equal Protection Clause of the Fourteenth Amendment commands that no

State shall 'deny to any person within its jurisdiction the equal protection of the laws,'

which is essentially a direction that all persons similarly situated should be treated alike."

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S.

Const. amend. XIV.).[5] In the case before us, the parties have agreed that rational basis is the appropriate standard of review; see Pl.'s Br. at 1. Rational basis review requires the plaintiff to prove that: (1) the defendant(s) intentionally treated the plaintiff differently from others similarly situated; (2) the difference in treatment was caused by the plaintiff's membership in the class to which it belongs; and (3) the different treatment was not rationally related to a legitimate state interest. *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009) (citing *Smith v. City of Chicago,* 457 F.3d 643, 650–51 (7th Cir. 2006)). Thus, to succeed on its claims of an Equal Protection violation, Plaintiff must prove each of the above three elements.

### A.  Monarch's Similarly Situated Comparators

Plaintiff's first hurdle is to show that it was treated disparately from a similarly situated entity or group. *Smith,* 457 F.3d at 650–51. Unfortunately, in its briefing Monarch has entirely failed to identify any such comparator. We don't know if it intends to show that its treatment was unequal compared to other Tier 2 wholesalers or to other Tier 1 and 3 suppliers of alcohol to Indiana consumers.  t is essential to Plaintiff's success in this litigation that it produce evidence demonstrating that another group or entity is in fact similarly situated to it  but who received greater benefits under the law. Without a

---

[5] When a statute regulates certain fundamental rights, such as voting or privacy, or distinguishes between people on the basis of certain suspect characteristics, such as race or national origin, the statute is subject to strict scrutiny. *Zablocki v. Redhail,* 434 U.S. 374, 388 (1978). To survive strict scrutiny, the regulation must serve a compelling state purpose and be narrowly tailored to achieving that purpose. *Id.* When a statute distinguished between people on the basis of other identified characteristics, such as gender and illegitimacy, which are less suspect, it is subject only to intermediate scrutiny. *J.E.B. v. Alabama,* 511 U.S. 127, 136 (1994); *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 725 (1982). To survive intermediate scrutiny, the regulation need only serve an important state interest and the means employed need only be substantially related to that interest. *Id.*

similarly situated comparator, Equal Protection claims simply "cannot hold water."

*Harvey v. Town of Merrillville*, 649 F.3d 526, 531 (7th Cir. 2011); *RJB Prop., Inc. v. Bd.*

*of Educ. of Chicago,* 468 F.3d 1005, 1010 (7th Cir. 2006).

      In response to Defendants' argument that there exist no similarly situated

comparators, Monarch rejoins stating that it is simply making a "facial challenge" to the

statutes and that "the equal-protection claim [it] is making focuses on whether it makes

sense to prohibit beer wholesalers from obtaining a permit to wholesale liquor *in the first*

*place.*" Pl.'s Br. at 18 (emphasis in original).  Sidestepping entirely the need to identify

any similarly situated comparators, Monarch dives headlong into a discussion of whether

the Indiana Code's prohibition against a wholesaler's possession of both a beer and liquor

wholesale permit is fair and whether it is rationally related to a legitimate government

interest.

      In ignoring the comparability issue, Monarch fails to prove an "essential" element

of its claim. *Harvey*, 649 F.3d at 531. While it is true that the challenged statutory

provisions must be rationally related to a legitimate governmental interest, they must also

be shown to deprive Monarch of its right to equal protection under the.  *See LaBella*

*Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 941–42 (7th Cir. 2010) ("All equal

protection claims, regardless of the size of the disadvantaged class, are based on the

principle that, *under like circumstances and conditions, people must be treated alike*,

unless there is a rational reason for treating them differently." ) (emphasis added).

Despite having failed to develop this essential element of its claim in its motion for summary judgment, Monarch did describe in its Complaint wine wholesalers as being "similarly situated." Compl. at ¶ 6. This is a thin reed on which to base so substantial an argument, but, assuming it is Monarch's intention to advance this theory, we will address whether alcohol distributors who are granted wine and liquor wholesale permits are sufficiently similar to beer wholesalers to support an Equal Protection Clause violation, if they did or do, in fact, receive unwarranted preferential status under the challenged statutes.

The "similarly situated analysis is not a precise formula, but…what is clear is that similarly situated [comparators] must be very similar indeed." *LaBella Winnetka,* 628 F.3d at 942; *see also Racine Charter One, Inc. v. Racine Unified Sch. Dist.,* 424 F.3d 677, 680 (7th Cir. 2005) (holding that comparators must be "*prima facie* identical in all relevant respects."). This is true because the Equal Protection Clause "does not require things which are different in fact or opinion to be treated in law as though they were the same." *Varner v. Monohan,* 460 F.3d 861, 865 (7th Cir. 2006) (citing *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). Typically, whether a comparator is similarly situated is a question for the fact-finder; however, summary judgment is appropriate when no reasonable fact-finder could find that a plaintiff has satisfied its burden on the issue. *Srail,* 588 F.3d at 945.

Defendants maintain that the business of beer wholesaling in Indiana differs in material ways from the business of wine and liquor wholesaling. Perhaps the most

significant difference they cite is the franchise protections enjoyed by beer wholesalers, which are unavailable to wine and liquor wholesalers. These protections make it unlawful for a manufacturer of beer to terminate a contract with a beer wholesaler "unfairly and without due regard for the equities of the [beer wholesaler]." Ind. Code § 7.1-5-5-9(c). Additionally, if a manufacturer acquires the rights to supply another brand of beer, before it may transfer the new brand's wholesale rights, the existing wholesaler must be paid the fair market value for the rights. *Id.* at § 7.1-3-25, *et. seq.* Further, the Alcohol and Tobacco Commission is obligated to investigate violations of the protections and has a duty to enforce any injunctions issued under them. *Id.* at § 7.1-2-3-26.

Wine and liquor distributors, on the other hand, are not protected from a manufacturer's decision to terminate an existing contract, nor are they entitled to payments based on fair market value of their wholesale rights if those rights are transferred to another wholesaler. Based on these unique protections that are applicable only to beer wholesaler, wine and liquor wholesale market contracts are crafted and analyzed in a different light. Due to Monarch's failure to present any evidence that contradicts or overcomes the regulatory differences between wholesaling beer and wholesaling wine and liquor, we hold that beer wholesalers are not similarly situated to wine and liquor wholesalers for purposes of Monarch's Equal Protection Clause claims.

Accordingly, summary judgment in favor of Defendants is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## B.  The Provisions' Rational Relation to Legitimate State Interests

Although Monarch's Equal Protection claim cannot succeed for lack of similarly situated comparators, we shall nonetheless address Monarch's related contention that the Prohibited Interest Provisions of Indiana's Code lack a rational relationship to the State's legitimate interests.   As we explain below, this theory is ultimately no more availing to Plaintiff in terms of salvaging his Equal Protection claim than his glib dismissal of the need for comparability turned out to be.

Under the rational basis test, "the government's action simply cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and *some* legitimate governmental purpose." *Smith*, 457 F.3d at 652 (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001)) (emphasis added). The government is not required to articulate the legitimate interest at the time of a statute's adoption; rather, "the burden is upon the challenging party to eliminate 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *Heller v. Doe,* 509 U.S. 312, 320 (1993)).   Moreover, because the rational basis test "is not subject to courtroom fact-finding," the government's reasons may be based even on "rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 315 (1993). Once a plausible basis for the legislation is identified, the inquiry by a court is at its end. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179 (1980). This basic formulation applies whether the plaintiff challenges a statute on its face, as applied, or challenges some other act or decision of government. *Smith*, 457 F.3d at 652 (collecting cases). When dealing with a local economic regulation,

the test becomes even more indulgent of the State's interests; in those cases "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013).

Here, Defendants have articulated more than one legitimate state interest to which the challenged provisions rationally relate. Monarch, in response, proffers a number of policy and fact-based arguments, many of which are unconvincing.[6]

Title 7.1 of the Indiana Code recites three specific purposes as justifications for these provisions: (1) to protect the economic welfare, health, peace, and morals of the people of Indiana; (2) to regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages; and (3) to provide for the raising of revenue. Ind. Code. § 7.1-1-1-1. While Monarch does not argue that these interests underlying the statute are not legitimate, it contends that the Prohibited Interests Provisions do not rationally correspond to or reflect the stated purposes.

---

[6]     Monarch has devoted a significant portion of its brief to expounding on the allegedly flawed origins of Indiana's alcohol regulatory system, stating that the General Assembly never provided an explanation for the provisions at issue and suggesting that they were "enacted to protect and promote a patronage system that once operated to the benefit of state and local politicians." *See* John D. Barnhart & Donald F. Carmony*, 2 Indiana from Frontier to Industrial Commonwealth* 480 (1954). This line of attack by Monarch ignores the rule that "we never require a legislature to articulate its reasons for enacting a statute, [and] it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).
        In addition, although Monarch has conceded that this case can is to be analyzed under the rational basis standard, it cites cases that invoke intermediate and strict scrutiny, including analogizing our case to the landmark decision in *Loving v. Virginia*, 388 U.S. 1 (1967).

Defendants advance multiple ways in which the Prohibited Interest Provisions could be seen as furthering, or interpreted to further the purposes of Title 7.1: for one, Indiana restricts beer wholesalers from obtaining liquor permits in order to maintain certain minimum prices for alcoholic products, reasoning that increased competition from beer wholesalers could depress liquor prices, leading to increased liquor consumption, addiction, and other societal ills.[7] Defs.' Br. at 9–12, 32–33. According to Defendants, if beer wholesalers were also allowed to wholesale liquor, they could capitalize on their already-existing infrastructure and their protected status under the Indiana "franchise protections" to cut prices and gain a competitive advantage over existing liquor wholesalers. *Id.* at 32. Because Indiana imposes no floor on alcohol prices and allows alcohol to be sold at or below cost, Defendants maintain that there would be nothing to stop beer wholesalers who also obtain liquor permits from depressing alcohol prices in order to gain new business in the liquor market.

In response, Monarch describes Indiana's prohibition on the combined wholesale of beer and liquor as a "ludicrously ineffectual" means of maintaining high prices on alcohol. *See Plyer*, 457 U.S. at 228. Monarch points to alternative methods utilized in other states to inflate alcohol prices, focusing specifically on the use of excise taxes. *See* N. Gregory Mankiw, *Smart Taxes An Open Invitation to Join the Pigou Club*, 35 E. Econ.

---

[7] Defendants have cited studies linking alcohol abuse to societal costs and ills such as drunk driving, alcoholism, sexual abuse and violence, cognitive delays, lost work, and medical costs. These reports also link the price of alcohol to the consumption of alcohol. Bedwell Decl. at ¶ 5, Defs.' Exs. 7–17.  Studies also show that the price of alcohol affects the consumption of alcohol—higher prices means less consumption and lower prices means more consumptions. *Id.,* Defs.' Exs. 7, 8, 15. Monarch does not dispute that curbing consumption and maintaining high prices are legitimate state interests.

J. 14, 16 (2009) (arguing that the best way to regulate goods with social costs is to impose a tax that accounts for the additional social cost of the good.) Monarch points out that Indiana ranks as one of the lowest states in terms of its use of excise taxes on alcohol, arguing that a hike in taxes would better accomplish the stated goal of maintaining high alcohol prices.[8]   Monarch also proposes that Indiana could require minimum mark-ups on alcohol at the wholesale or retail level or that it could prohibit wholesalers from selling products at or below costs. Pl.'s Br. at 24.  According to Monarch, any of these alternative methods would better serve the State's purported interest in maintaining high alcohol prices.

Monarch's arguments, while perhaps reflecting sound legislative policy, do not represent sound judicial analysis.  It is immaterial to our analysis whether other states impose higher excise taxes or employ minimum mark-ups or create prohibitions on selling alcohol at or below costs as methods for maintaining high alcohol prices. "In the realm of social and economic regulation, the states are free to experiment and are given great latitude in determining who shall benefit from a particular enactment." *Sidle v. Majors*, 536 F.2d 1156, 1157 (7th Cir. 1976); s*ee also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.") (Brandeis, J.).

---

[8] The Tax Foundation ranks Indiana 42nd in beer excise tax, 42nd in liquor excise tax, and 35th in wine excise tax. Pl.'s Exs. 19–21; See Ind. Code §§ 7.1-4-2-1, 7.1-4-3-1, 7.1-4-4-1.

Indiana may not have chosen the "best way" to ensure high prices for alcohol and to realize its public policy goals, but the State is not required to choose the best or wisest way to regulate industry. *Beach Commc'ns, Inc.,* 508 U.S. at 313–15. Rational basis review necessarily elides judicial fact-finding. Ours is not to determine the best way to regulate an industry or to judge the wisdom or logic of legislative choices. *Id.* "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley,* 440 U.S. 93, 97 (1979). Accordingly, we defer to the policy choices made by the Indiana General Assembly regarding the appropriate method for inflating the price of alcohol, especially in light of Monarch's inability to show that the State's rationale does not represent a "conceivable state of facts [capable of providing] a rational basis for the [prohibition]." *See Heller,* 509 U.S. at 320.

Defendants note that, in addition to maintaining high prices on alcohol, the prohibition restricting beer wholesalers from also obtaining liquor permits and vice-versa results in a higher overall number of wholesalers in Indiana, given that beer wholesalers would otherwise have the power to eliminate the current liquor wholesalers, if they were allowed to enter the liquor market. Defs.' Br. at 32. As Defendants explain, liquor wholesalers would face greater difficulty in entering the beer market than beer wholesalers would in entering the liquor market, since beer wholesalers would be able to rely on contractual and statutory protections which liquor and wine wholesalers do not

receive currently enjoy. *Id.*  According to Defendants, the maintenance of a large number of wholesalers across the state is desirable for two reasons. First, the overall number of wholesalers directly correlates to the overall number of warehouses, trucks, employers, and employees, all of which generate tax revenue—an express goal of Title 7.1. Defs.' Br. at 33–35; see Ind. Code § 7.1-1-1-1(4). Second, the number of wholesalers equals the number of industry "watchdogs" who report violations to the Alcohol and Tobacco Commission, which is an important entitlement given to wholesalers; a higher number of such watchdogs is important in light of the fact that there are only 80 Indiana Excise Officers who are charged with enforcing all aspects of Title 7.1 throughout the State. Bedwell Decl. at ¶ 24.

Monarch rejoins that "market realities" cannot justify Defendants' theory that beer wholesalers would drive out existing liquor wholesalers. Pl.'s Br. at 30. Monarch says the opposite is true: that permitting beer wholesalers to enter the liquor market and compete with the "entrenched incumbents" is more likely to disrupt oligopoly conditions than to create them. *Id*. However, Monarch's argument fails to take into account that, under a rational basis review, the government's reasons prevail even if they are based only on "rational speculation unsupported by evidence or empirical data," *Beach Commc'ns, Inc.,* 508 U.S. at 315, and that "courts are compelled ... to accept a legislature's generalizations.... " *Heller*, 509 U.S. at 321. Defendants need not rely on "market realities" to support their reasons for these controls; they need only present rational speculation, which a court compelled to accept.  Defendants' theory that allowing beer

distributors to compete against liquor and wine distributors would decrease the overall number of wholesalers and deprive the state of tax revenue and industry oversight is a rational reason, and as such we accept it here.

Given these plausible bases for the Indiana's Prohibited Interest Provisions, our analysis comes to an end.[9] *See United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179 (1980). Monarch has failed to eliminate "any reasonably conceivable state of facts that could provide a rational basis for the [the General Assembly's] classification." *Heller* 509 U.S. at 320. Accordingly, Defendants are entitled to summary judgment.

## Conclusion

For the reasons set forth above, we hold that Sections 7.1-3-3-19, 7.1-5-9-3, 7.1-5-9-4, and 7.1-5-9-6 of the Indiana Code have not been shown to violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution as it pertains to Indiana beer wholesalers such as Monarch Beverage Co. Inc. Accordingly, Defendants' motion for summary judgment [Docket No. 79] is **GRANTED** and Plaintiff's cross motion for summary judgment [Docket No. 93] is **DENIED**. Plaintiff's motion for oral argument [Docket No. 96] is also **DENIED**. Final Judgment shall enter in favor of Defendants.

---

[9] Defendants also asserted that the existence of the "franchise protections" granted only to beer wholesalers would be a sufficient justification for prohibiting beer wholesalers from also engaging in liquor wholesaling. Monarch has argued that the State may not rely on this justification as it postdates the passage of the provisions at issue. *See Zobel v. Williams*, 457 U.S. 55, 61–62 (1982). Because Monarch has the burden of eliminating <u>every</u> reasonably conceivable state of facts that could provide a rational basis for the provisions, we do not necessarily accept Monarch's argument but we need not address it as an alternative basis for the challenged provisions of state law.

IT IS SO ORDERED.

09/30/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Steven M. Badger
BADGER LAW OFFICE
sbadger@badgercounsel.com

Michael P Maxwell, Jr
CLARK QUINN MOSES SCOTT & GRAHN LLP
mmaxwell@clarkquinnlaw.com

Michael P Maxwell, Jr
CLARK QUINN MOSES SCOTT & GRAHN LLP
mmaxwell@clarkquinnlaw.com

John B. Herriman
CLARK, QUINN, MOSES, SCOTT & GRAHN
bherriman@clarkquinnlaw.com

Derek R. Molter
ICE MILLER LLP
derek.molter@icemiller.com

Richard A. Smikle
ICE MILLER LLP
richard.smikle@icemiller.com

Kenneth Lawson Joel
INDIANA ATTORNEY GENERAL
kenneth.joel@atg.in.gov

Sara Teresa Martin
INDIANA ATTORNEY GENERAL
sara.martin@atg.in.gov

Betsy M. Isenberg
OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Allison B. Jones
WILLIAMS & CONNOLLY LLP
ajones@wc.com

Kannon K. Shanmugam

WILLIAMS & CONNOLLY LLP
kshanmugam@wc.com

Amy  Saharia
WILLIAMS & CONNOLLY, LLP
asaharia@wc.com

Barry S. Simon
WILLIAMS & CONNOLLY, LLP
bsimon@wc.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MONARCH BEVERAGE CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-01674-SEB-MJD |
| | ) | |
| DALE  GRUBB in his official capacity as | ) | |
| Commissioner of the Indiana Alcohol and | ) | |
| Tobacco Commission, | ) | |
| DAVID  COOK In his official capacity as the | ) | |
| Chairman of the Indiana Alcohol and Tobacco | ) | |
| Commission, | ) | |
| DAVID  COLEMAN In his official capacity as | ) | |
| the Vice Chairman of the Indiana Alcohol and | ) | |
| Tobacco Commission, | ) | |
| MARJORIE  MAGINN In her official capacity | ) | |
| as the Commissioner of the Indiana, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| INDIANA BEVERAGE ALLIANCE, | ) | |
| WINE & SPIRITS DISTRIBUTORS OF | ) | |
| INDIANA, | ) | |
| | ) | |
| Amicus. | ) | |
| | ) | |

**JUDGMENT**

Pursuant to the Court's ruling simultaneously entered on this date, final judgment is

hereby entered in favor of Defendants and against Plaintiff.

IT IS SO ORDERED.

Date:        09/30/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

App. 22

Distribution:

Steven M. Badger
BADGER LAW OFFICE
sbadger@badgercounsel.com

Michael P Maxwell, Jr
CLARK QUINN MOSES SCOTT & GRAHN LLP
mmaxwell@clarkquinnlaw.com

Michael P Maxwell, Jr
CLARK QUINN MOSES SCOTT & GRAHN LLP
mmaxwell@clarkquinnlaw.com

John B. Herriman
CLARK, QUINN, MOSES, SCOTT & GRAHN
bherriman@clarkquinnlaw.com

Derek R. Molter
ICE MILLER LLP
derek.molter@icemiller.com

Richard A. Smikle
ICE MILLER LLP
richard.smikle@icemiller.com

Kenneth Lawson Joel
INDIANA ATTORNEY GENERAL
kenneth.joel@atg.in.gov

Sara Teresa Martin
INDIANA ATTORNEY GENERAL
sara.martin@atg.in.gov

Betsy M. Isenberg
OFFICE OF THE ATTORNEY GENERAL
Betsy.Isenberg@atg.in.gov

Allison B. Jones
WILLIAMS & CONNOLLY LLP
ajones@wc.com

Kannon K. Shanmugam

WILLIAMS & CONNOLLY LLP
kshanmugam@wc.com

Amy  Saharia
WILLIAMS & CONNOLLY, LLP
asaharia@wc.com

Barry S. Simon
WILLIAMS & CONNOLLY, LLP
bsimon@wc.com